182 Cal.App.4th 1190 (2010)
D.C., a Minor, etc., et al., Plaintiffs and Respondents,
v.
R.R., a Minor, etc., et al., Defendants and Appellants.
No. B207869.
Court of Appeals of California, Second District, Division One.
March 15, 2010.
*1199 Rex Julian Beaber for Defendants and Appellants.
Robert S. Gerstein; and Jennifer L. Lynch for Plaintiffs and Respondents.

OPINION
MALLANO, P. J.
A 15-year-old high school student was pursuing a career in entertainment and maintained a Web site for that purpose. Several of his fellow students posted messages at the Web site, making derogatory comments about his perceived sexual orientation and threatening him with bodily harm.
The aggrieved student and his parents filed this action against the other students and their parents, alleging a statutory claim under California's hate crimes laws (Civ. Code, §§ 51.7, 52.1) and common law claims for defamation and intentional infliction of emotional distress. In response, one of the student-defendants and his parents filed a special motion to strike, contending that the action was a "strategic lawsuit against public participation" (SLAPP) (Code Civ. Proc., § 425.16; all undesignated section references are to that code unless otherwise indicated). The student-defendant had posted a message stating in part: ". . . I want to rip out your fucking heart and feed it to you. . . . I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell." The trial court denied the anti-SLAPP motion on the ground that the lawsuit did not arise out of a statement made in connection with a "public issue." (§ 425.16, subds. (b)(1), (e)(3).) Defendants appealed.
We affirm because defendants did not make the requisite showing that plaintiffs' complaint is subject to the anti-SLAPP statute. In particular, defendants did not demonstrate that the posted message is protected speech. Further, defendants contend the message was intended as "jocular humor." Assuming the message was a "joke"played by one teenager on another it does not concern a "public issue" under the statute. (See § 425.16, subds. (b)(1), (e)(3).)

I

BACKGROUND
The following allegations and evidence are taken from the pleadings and the papers submitted in the trial court with respect to the anti-SLAPP motion.
*1200 D.C., the student-plaintiff, attended Harvard-Westlake School (Harvard-Westlake), a private educational institution in Los Angeles. D.C. filed this action against several other students through a guardian ad litem, his father. D.C.'s father and mother also pleaded claims in their own right. (We will refer to D.C. and his parents collectively as plaintiffs.) Plaintiffs also named as defendants the parents of each student-defendant; the parents were sued as guardians ad litem and individually for their child's conduct (see Civ. Code, § 1714.1). (We refer to the student-defendants and their parents collectively as defendants.) Harvard-Westlake, its board of directors, and three school employees were also sued. The claims against them were arbitrated pursuant to an arbitration provision in the school's enrollment contract. (See D.C. v. Harvard-Westlake School (2009) 176 Cal.App.4th 836 [98 Cal.Rptr.3d 300].)

A. Complaint

Plaintiffs commenced this action on April 25, 2005. A first amended complaint (complaint) was filed on June 8, 2005, and alleged as follows.
While a student, D.C. pursued a career as a singer and an actor. He had a record album with a planned release date, had broadcast a song worldwide via satellite radio, and had played the leading role in a feature film presented at an internationally acclaimed film festival. He had also toured under the auspices of a nationally recognized radio network.
D.C. maintained a Web site to promote his entertainment career. The site allowed any member of the public to post comments in a "guestbook." Several students at Harvard-Westlake went to the Web site and posted threats against D.C. and made derogatory comments about him. One post read, "Faggot, I'm going to kill you." Another read, "[You need] a quick and painless death." One student wrote, "Fuck you in your fucking fuck hole." Another commented, "Fucking ass clown. Nigga what?" One post announced, "You are now officially wanted dead or alive." Another threatened, "I will personally unleash my manseed in those golden brown eyes."
The students who posted the threats sought to destroy D.C.'s life, threatened to murder him, and wanted to drive him out of Harvard-Westlake and the community in which he lived. They were motivated by a misperception of D.C.'s sexual orientation. When D.C.'s father read the threats at the Web site, he immediately informed Harvard-Westlake of the problem, believing that some of its students were responsible. The father also contacted the Los Angeles Police Department (LAPD), which, in turn, notified the Federal Bureau of Investigation.
*1201 On the advice of the police, D.C. withdrew from Harvard-Westlake. He and his family moved to Northern California, where he went to a different educational institution. The Harvard-Westlake student newspaper, The Chronicle, ran at least two articles on the matter. One article disclosed D.C.'s new residential location and the name of the school he was attending. The article also disclosed that posts at the Web site had referred to D.C. as a "faggot." Harvard-Westlake did not suspend or expel any of the students who admitted posting the threats.
As a consequence of defendants' conduct, plaintiffs suffered personal and emotional injury, loss of income, the payment of medical expenses, the cost of moving, expenses for traveling back and forth from their new residential location to Los Angeles in order to support D.C.'s professional career commitments, and the related cost of housing while staying in Los Angeles.
The complaint contained five causes of action against defendants, only three of which are relevant here. First, plaintiffs alleged that defendants had violated their right under the state hate crimes laws to be free from "threat[s] of violence" motivated by perceived sexual orientation. (Civ. Code, § 51.7, subd. (a); see id., 52.1.)[1] Second, in a defamation claim, plaintiffs asserted that defendants had libeled D.C. by calling him a homosexual. Third, plaintiffs alleged a claim for intentional infliction of emotional distress, contending that defendants' conduct was outrageous and had caused plaintiffs to suffer severe emotional distress. All three of these causes of action were based on the posted threats and their effect on plaintiffs.
Plaintiffs named as defendants six students and their parents. Among those sued were R.R., a student, and his parents (collectively the R.'s).

B. Anti-SLAPP Motion

On July 20, 2005, the R.'s filed an anti-SLAPP motion, contending that R.R.'s posted message was protected speech or, more specifically, a written statement or writing made in a public forum in connection with an issue of public interest. (See § 425.16, subd. (e)(3).) The motion was supported by several declarations, including ones from R.R. and his father. In opposing the motion, plaintiffs relied primarily on a declaration from D.C.'s father. Both sides submitted declarations from law enforcement personnel.
R.R. posted the following message on D.C.'s Web site: "Hey [D.C.], I want to rip out your fucking heart and feed it to you. I heard your song while *1202 driving my kid to school and from that moment on I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell."
Posts by other students included: (1) "I hate fags. . . . diefags@ yahoo.com. . . . gays are evil.com. . . . Hey fucker. . . . You are real gay"; (2) "Faggot, I'm going to kill you"; (3) "You are an oversized faggot. . . . I just want to hit you in the neckhard. . . . [G]o to the 405 [freeway] bridge and jump"; (4) "I hate fags. . . . You need to be stopped"; (5) "I am looking forward to your death"; and (6) "Not only are you a massive fagmo, but must absolutely quit showing your face at my school. You are now officially wanted dead or alive."

1. Declaration of D.C.'s Father

By way of background, D.C.'s father explained: "[D.C.], without exception, uses the pseudonym `Danny Alexander' in his entertainment career.
". . . Nowhere on the subject website . . . nor in any publicity material, album packaging, or on film credits has [D.C.] been identified by his legal name.
". . . Like many other aspiring entertainers, [D.C.] deliberately chose to use a stage name precisely so he could enjoy a `dual life,' one which afforded him the luxury of anonymity outside the entertainment industry. [¶] . . . [¶]
". . . Of the thirty-four (34) outrageously offensive original postings made on [D.C.'s Web site] that are the subject of this lawsuit, twenty-three (23) falsely identify [D.C.] as a homosexual.
". . . I am informed, believe, and thereon allege that those twenty-three (23) postings regarding sexual preference originated from no less than ten (10) distinct computer systems.
". . . The website . . . was permanently removed from the Internet. . . the same day the postings were discovered. [¶] . . . [¶]
". . . The LAPD disagreed with [a school administrator's] `intuition' that the school posed no danger to [D.C.] and therefore advised me to have [D.C.] stay home from school until a thorough investigation had been completed. [D.C.] did attend a PSAT exam at the school with great trepidation and only after I discussed the matter with the administration and stayed on site to watch him throughout the testing without causing any disturbance to students sitting for the college entrance examination. Other than that one examination, *1203 [D.C.] did not return to the school due to fear for his life. If the threats were nullified, it would have been our preference to have him continue to attend Harvard-Westlake and remain in Beverly Hills.
". . . We waited . . . for an outcome to the investigation through the school and the authorities, but without obtaining the information necessary to insure our son's safety we were compelled to enroll [D.C.] . . . at another school in order to salvage what was left of his first semester of his critical junior year. Despite this enrollment we would have sought to have him return if we had been assured that he was safe from the vicious threats of violence and taunting as shown in the posts. I had to commute to Los Angeles from [Northern California] during the week and be away from my family which was incredibly stressful for the entire family and caused additional stress on . . . my wife over the concern for [D.C.] and his safety while I was gone.
". . . Of the thirty-four (34) offensive postings originally posted, six (6) were perceived [as] death threats by me and my family. These included the one[] admitted to by [R.R.] . . . . [¶] . . . [¶]
". . . [R.R.'s message] in particular was the most evil and malicious of the postings and looked to come from a parent rather than a student. My family was terrified and made physically nauseous from the threat. We feared for the life of our fifteen year old child. The fact that others wanted to `one-up' each other as [R.R.] asserts in his declaration furthers our belief that the boys worked in concert to terrify my family like a gang of thugs driving us to pull our son from school and move. There was nothing `playful' in the post, and the fact that [R.R.] still believes this is alarming and renews our concerns for persons that offend him by sexual orientation or otherwise. [¶] . . . [¶]
". . . Because [D.C.] was uprooted mid-semester in his junior year of high school, and because of the threat of death, its impact on his family, and continued stress, his school life and career were adversely affected. Further, due to the threats and gay vulgar lies posted [D.C.] started to suffer from frequent and severe panic attacks which required medical attention, and from which he still suffers occasionally to this date. For the first time in his life after the postings people approached [D.C.] to discuss what was posted and asked him about being gay. It was clear that others that read the posts believed the comments about his sexual orientation and felt concern for him and his safety. This also added to [D.C.'s] embarrassment and to his distress.
". . . [O]ur family suffered: emotional distress; anxiety; sleeplessness; physical pain; insecurity; fear; pain and suffering; payment of attorneys' fees; payment of medical expenses; payment of moving expenses; payment of *1204 traveling and housing expenses to and from Los Angeles to support our business endeavors; [and] [D.C.]'s lost income . . . .
". . . [D.C.] suffered poor academic performance during his junior year, which compelled our family to hire a tutor and education therapist, and which ultimately resulted in his continued suffering from emotional distress and anxiety, and adversely affecting his self-esteem, school life and earning potential. In fact, the movie `Steal Me' [(Cineville & Picture Entertainment Corp. 2005)] in which [D.C.] had the lead was not released to the public until well after the malicious postings had occurred.
"The LAPD advised my family that [D.C.] should not return to school at [Harvard-Westlake] until a thorough investigation had been completed."

2. R.R.'s Declaration

R.R. explained at length why he posted the message: "Prior to my sending of an email posting to [D.C.] . . ., I had no relationship with [him], and, . . . to my knowledge, I had seen him at Harvard Westlake from a distance on several occasions, walking through the halls, but never had verbal or physical contact with him. Prior to the email incident . . ., I attended a PSAT preparatory session which was attended by approximately seven students. I knew [D.C.] was one of these students. We did not interact with each other in any manner during this PSAT session. I had not met [D.C.] before that session; we had never been in the same class; and, to my knowledge, we never participated in the same school activities. Moreover, I had not heard anything about him. I had no knowledge of his acting or singing involvement, did not know his interests or habits, and was unaware of who his friends were at school. Prior to the . . . email incident, I had no opinion about [D.C.] whatsoever. I did not like or dislike him and certainly had no views about his gender identity, sexual orientation, or skills as a singer or actor. Likewise, I had never heard any fellow student convey any opinion about him generally, or with regards to any aspect of his life, including his sexual orientation. I certainly did not harbor any ill will against him or his family, and, in fact, the only reason I knew his name is that our school is very small and I know the name of almost every student in my class. . . .
". . . Sometime after I first saw [D.C.] at the PSAT session . . ., while I was at Harvard Westlake School, a fellow student suggested that I should `check out' the website of a fellow student, i.e. [D.C.] The student did not tell me the content of the website; did not ask me to post any messages on the website; did not tell me that he was going to post any messages on the website; and did not give me any information about [D.C.] My fellow student, did, however, suggest I look at the site in a tone of voice suggesting *1205 that there was something weird, strange, or far out about the website. My fellow student did not invite me to participate in any `conspiracy' and made no suggestion that I do anything but just take a look at the site.
". . . After that school day, I returned home at my regular time. When I turned on my computer, I received an instant message from the fellow student providing me with an Internet link to the [D.C.] website. The instant message did not suggest that I post messages, or provide any suggestions about how I should respond to the website. In fact, at the time I received this message I was completely unaware that the site provided for the posting of messages. . . .
". . . Almost immediately after receiving the instant message, I used the link to see [D.C.'s] website because I was curious about what the interest was in the website. When I first entered [D.C.'s] website, I was greeted by a picture of him with music and singing playing in the background. When I surveyed the site with its links, it immediately revealed more pictures, that were very posed, and a biography of [D.C.'s] alleged accomplishments. In the site, [D.C.] describes himself in the way products are advertised. He described his eyes as `Golden Brown.' He describes his hair as `Midnight Brown.'. . . After listing his accomplishments, he is pictured with a shirt that prominently displays the word `SUCCESSFUL.' The site then links the viewer to [D.C.'s] fan mail which to this day includes obsequious fan messages that appear calculated to give the impression that [D.C.] is a person of extraordinary fame and talent. . . . [¶] . . . [¶]
"The messages refer to [D.C.] as `Danny Alexander' because the website itself uses a pseudo name rather than his real name, making it unclear as to whether the whole site is a spoof.
". . . My initial response to the site was to be offended and put off by its `I am better than you' attitude and its blatant bragging and self promotion. In the past, I had spent time studying Buddhism, and in light of the Buddhist tradition of quiet understatement, the website's distinctly narcissistic tone was disturbing. On the other hand, I was a bit entertained by [the] weird, possibly satirical, tone of the site. I certainly appreciated why a fellow student would want me to `check this out.'
". . . [D.C.'s] website also had a link that allowed a viewer to post public messages and to view the posting made to the website. The website invited postings. The postings included messages from admirers writing as if he were a famous movie star and singer. [D.C.] portrayed himself as a public figure. I then began looking at the posted messages. There were many messages, apparently from fellow students, that were hostile and derogatory, albeit jesting. I did not know the identity of the posting persons. I did, however, *1206 suspect that at least some of the messages were from Harvard Westlake students because the messages referred to Harvard Westlake.
". . . I sensed that the other writers had a similar emotional response to the site that I had. As these postings became increasingly bizarre and weird, it became apparent to me that everyone was competing to see who could be the most outrageous. For example, one poster suggested that he was an `official' representative of the student body and that [D.C.] was wanted dead or alive. I thought the postings were funny, and I certainly didn't think that [D.C.], or any other rational person, would believe that he was wanted dead or alive. Likewise, another posting referred to [D.C.] as a `Nigga.' Of course, [D.C.] was obviously not a black American. Yet another posting referred to the poster's wish to `unleash my manseed in those golden brown eyes.' This appeared to be an obvious satire of [D.C.'s] own self description as the wonder boy with `golden brown' eyes.
". . . That afternoon, I was in a playful mood and I decided to add my own message to the Internet graffiti contest that was apparently going on. I posted a message which stated: `Hey [D.C.], I want to rip out your fucking heart and feed it to you. I heard your song while driving my kid to school and from that moment on I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell.'
". . . My motivations in sending this email had nothing to do with any perception of [D.C.'s] sexual orientation, and certainly did not reflect an intention to do him physical harm. As set forth above, I had no personal knowledge or belief about [D.C.'s] sexual orientation. No one ever told me he was gay, and I had no thoughts on the subject matter. My message is fanciful, hyperbolic, jocular, and taunting and was motivated by [D.C.'s] pompous, self aggrandizing, and narcissistic websitenot his sexual orientation. My only other motivation, a bit more pathological, was to win the one-upmanship contest that was tacitly taking place between the message posters. Everything about the message is fanciful. I assumed that any rational person would understand that I was just inarticulately and offensively saying, `I am repulsed by your self promotional style.' I certainly did not think anyone would believe that they could eat their own heart after it was taken from their body. I assumed that a 10 year old child would understand that you would be dead if your heart was removed. I obviously didn't have school age children and I had never listened to any of [D.C.'s] songs. Paradoxically, my message states that my motivation was a hatred of [D.C.'s] song, not his sexual orientation, i.e., my message itself . . . belies the allegation in the complaint.
*1207 ". . . The complaint alleges that my motivation was my perception that [D.C.'s] sexual orientation was gay. As set forth above, I had no opinion regarding [D.C.'s] sexual orientation. More importantly, I wouldn't care less if he was gay. I have no animosity towards gays, and . . . even if I thought [D.C.] was gay, it couldn't be a basis for any hatred or threat. . . . [O]ne of my favorite relatives is openly homosexual and I have been quite vociferous in defending this relative from fundamentalist views that characterize homosexuality as a disease. In fact, one [of] my good friends at school is a member of the Gay-Straight Alliance. I have made my views clear that I think this student's involvement is `cool.' Likewise, I have walked side by side with gay couples in the AIDS walk, supporting their position, and I have worked through a church at a soup kitchen for AIDS patients, many of whom are gay. . . . I am not homophobic and the basis of my conduct was childishness and some repulsion to [D.C.'s] grandiose stylenot his sexual orientation.
". . . The next day after the offensive postings, at school, I heard students talking about the posts. The students expressed the view that the posts were a funny gag. No one took the posts seriously as a death threat or an accusation of homosexuality. The posts were treated as a goof. I did not participate in these conversations because I was ashamed of my participation. In retrospect, my conduct felt infantile, immature, and was beneath me. I felt ashamed that I would allow the desire for peer approval, `peer pressure,' to induce me into acting like an idiot.
". . . Shortly after sending these messages, I again saw [D.C.] at the PSAT preparation class. He was not acting as if he were afraid that he was going to be killed. He appeared calm and participated in exactly the same manner as the preparation session before the Internet graffiti contest. We did not interact at all. . . . [¶] . . . [¶]
". . . I wrote a letter of apology to [D.C.] and his family. The school provided me with the address of [D.C.'s] father and I sent the letter to that address. In that letter, I admit my email transmission and state: `I want you to know that I never intended to harm you or your family, and that I respect your career and what you are trying to do with your life.' At the end of that letter I stated: `If there is anything else I can do to atone for my actions, please let me know.' I never received a response to this letter. After sending this letter to [D.C.], I sent a copy to the Harvard Westlake School . . . ."

3. Declaration of R.R.'s Father

R.R.'s father stated in part: "My son [R.R.] is 17 years old. Approximately two years ago, I purchased a computer for my son and gave it to him for his personal use as a gift. My son needed a computer to do school research and *1208 to be able to draft papers. Our family considered the computer essential to be able to communicate with teachers and other personnel regarding school work and school related affairs. Sometime shortly after I purchased this home computer, I counseled my son to be careful about being appropriate in his use of the computer. I have learned from my son that he used his home computer to send one of the messages which are referenced in the law suit.
". . . [R.R.'s] computer is located in his bedroom. I do not have a password to any of his accounts, and . . . my son uses an account for emails different than the one that I use. . . . [T]here is no way for me to know the content of any email sent or received by [my] son unless he happens to tell me. Prior to my son's communication which is the subject of this lawsuit, I was not aware that he sent any messages with accusatory, threatening, or inappropriate content. I never saw any such messages; my son never reported sending such messages; I never received any complaint about any such messages. Contrary to the allegations in the complaint, I never allowed or permitted my son to engage in the conduct alleged. I had no idea that he sent such messages; never suspected he sent such messages; and, because I did not have his password[,] I did not have any ability to read his emails. Had I known that [R.R.] sent this kind of message, I would have counseled him not to do so. I would have offered such counseling, and would have barred his access to the Internet if he did not agree to abstain, because I find the communications offensivenot because they might be technically illegal or subject to civil liability.
". . . In fact, as soon as my wife . . . and I discovered the conduct alleged in the complaint, we terminated [R.R.'s] access to the Internet, instituted various punishments including grounding, no cell phone use (except for emergencies), [and] no car use and had him evaluated by a psychiatrist in a further effort to insure that such conduct was never repeated and the root cause, if any, was dealt with immediately . . . . [¶] . . . [¶]
". . . Prior to this episode [R.R.] has never been the subject of any criminal complaint or juvenile complaint of any kind. . . . Our family (including [R.R.]) cooperated with the police investigation immediately without asserting our legal right to remain silent. They reported to us their conclusion that they did not regard [R.R.'s] statement as a real threat and did not intend to seek the filing of any kind of criminal case. [R.R.] has not been charged with a crime or any wrongdoing by any law enforcement entity . . . .
". . . I have never heard [R.R.] make any negative, derogatory, or hostile statements about homosexuals. . . . [¶] . . . [¶]
". . . I have observed [R.R.] to be compassionate, well grounded, with many friends. To my knowledge, [R.R.] has never once gotten into a physical *1209 fight with anyone and he has never threatened to hurt anyone. [R.R.] is somewhat introverted and gentle, and he has an artistic fondness for music.. . . [R.R.'s] proclivity to humanistic and non-violent approaches to the human condition has been reflected in his past interest and practice of Buddhism and being a vegetarian."

4. Declaration of Another Student

The R.'s submitted a declaration from another Harvard-Westlake student who described some of the messages posted at D.C.'s Web site. For example, one post read in part: "You are so fucking orgasmic. I'm wet. . . . Oops I peed my pants. You look exactly like Britney. . . . Your career is bound to go nowhere." One student wrote: "You are the biggest fag in the HW class . . . . [T]hank you though. . . . [T]his will give everyone laughs for a long long time." In a second post, the same student said: "Hey [D.C.], I'm so excited to finally speak to you. We here at KY Jelly . . . wanted to know if [you] would be the spokesperson for our new anal lube. . . . Fucking ass clown. Nigga what?"

5. Law Enforcement Declarations

The deputy district attorney assigned to the criminal investigation submitted a declaration on behalf of the R.'s, stating that, based on the evidence, the district attorney's office declined to prosecute any of the students who had posted messages on D.C.'s Web site.
The police detective conducting the investigation also submitted a declaration in support of the motion, explaining that the LAPD "determined that [the] annoying and immature Internet communications did not meet the criteria for criminal prosecution." In a followup police report, the LAPD "determined that the emails were an expression of 1st Amendment rights and no crime."
Plaintiffs submitted a declaration from an employee in Harvard-Westlake's security department who had previously been an officer with the LAPD for 20 years. In the former officer's opinion, R.R.'s message constituted "a clear and specific threat of death" in violation of Penal Code section 653m. That statute provides: "Every person who, with intent to annoy, . . . makes contact by means of an electronic communication device with another and addresses to . . . the other person any threat to inflict injury to the person . . . is guilty of a misdemeanor." (Id., subd. (a).) The former officer stated that the Web site posts "depict in my opinion a group attempting to antagonize the victim and evidence a group behavior to work in concert together to harass, annoy, and at times threaten with violence and intimidation a boy perceived to be gay. *1210 The fact that many discussed it at school and then were able to read others' comments and add additional posts over a two day period . . . furthers my belief that they worked together to intimidate the victim and his family."

C. Trial Court's Ruling

The anti-SLAPP motion was heard on March 12, 2008, and taken under submission. By minute order dated May 6, 2008, the trial court denied the motion, concluding that the case did not involve a public issue. (See § 425.16, subds. (b)(1), (e)(3).) The R.'s appealed.

II

DISCUSSION
We review de novo the trial court's ruling on an anti-SLAPP motion. (See Flatley v. Mauro (2006) 39 Cal.4th 299, 325 [46 Cal.Rptr.3d 606, 139 P.3d 2].)
The R.'s argue that R.R.'s posted message was "jocular humor" entitled to First Amendment protection under the anti-SLAPP statute. We disagree for two reasons. First, the R.'s evidence as to whether R.R.'s message was protected speech is self-contradictory. Accordingly, we cannot say they demonstrated that the message is protected speech. Second, assuming that R.R.'s message was a "joke" and thus constitutionally protected, it was not a statement made in connection with a "public issue" as that term is used in the anti-SLAPP statute. (See § 425.16, subds. (b)(1), (e)(3).) Rather, it was merely part of a "joke" among teenagers.

A. Protected Activity Under the Anti-SLAPP Statute

(1) "`Litigation which has come to be known as SLAPP is defined by the sociologists who coined the term as "civil lawsuits . . . that are aimed at preventing citizens from exercising their political rights or punishing those who have done so." . . . [¶] . . . [¶]
"`SLAPP suits are brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. . . . [O]ne of the common characteristics of a SLAPP suit is its lack of merit. . . . But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective.. . . As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff *1211 in the political arena is substantially diminished.'" (Wilbanks v. Wolk (2004) 121 Cal.App.4th 883, 890-891 [17 Cal.Rptr.3d 497], citations omitted.)
(2) Under the anti-SLAPP statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1), italics added.) The statute is to "be broadly construed to encourage continued participation in free speech and petition activities." (Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi (2006) 141 Cal.App.4th 15, 22 [45 Cal.Rptr.3d 633]; see § 425.16, subd. (a).)
"`The Legislature enacted the . . . statute to protect defendants . . . from interference with the valid exercise of their constitutional rights, particularly the right of freedom of speech and the right to petition the government for the redress of grievances.'" (Contemporary Services Corp. v. Staff Pro Inc. (2007) 152 Cal.App.4th 1043, 1052 [61 Cal.Rptr.3d 434].)

1. Free Speech

(3) "`The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." The hallmark of the protection of free speech is to allow "free trade in ideas"even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . [T]he First Amendment "ordinarily" denies a State "the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." . . . The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .
"`The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. . . . The First Amendment permits "restrictions upon the content of speech in a few limited areas, which are `of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' ". . .
(4) "`. . . [A] State may punish those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." . . . Furthermore, "the constitutional guarantees of free speech and *1212 free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." . . . And the First Amendment also permits a State to ban a "true threat." . . .
"`"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." [ . . . Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.]' Virginia v. Black, 538 U.S. [343, 358-360] [155 L.Ed.2d 535, 123 S.Ct. 1536]
(5) "The United States Court of Appeals for the Fifth Circuit has articulated the rationale underlying the removal of true threats from first amendment protection. `The notion that some expression may be regulated consistent with the first amendment . . . starts with the already familiar proposition that expression has special value only in the context of dialogue: communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . . It is not plausible to uphold the right to use words as projectiles where no exchange of views is involved.' . . . Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir. 1991) . . . .
"That court further stated that, `[a]s speech strays further from the values of persuasion, dialogue and free exchange of ideas the first amendment was designed to protect, and moves toward threats made with specific intent to perform illegal acts, the state has greater latitude to enact statutes that effectively neutralize verbal expression.' Shackelford v. Shirley, supra, 948 F.2d at 938. Finally, that court concluded that, `as expansive as the first amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection.' Id. . . . [W]e must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . .
*1213 (6) "In the context of a threat of physical violence, `[w]hether a particular statement may properly be considered to be a threat is governed by an objective standardwhether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . Although a threat must be distinguished from what is constitutionally protected speech . . . this is not a case involving statements with a political message. A true threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment.' . . . Moreover, `[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners.' . . ." (State v. DeLoreto (2003) 265 Conn. 145 [827 A.2d 671, 679-681], citations omitted; accord, Corales v. Bennett (9th Cir. 2009) 567 F.3d 554, 563-564; Smithfield Foods v. United Food and Commercial (E.D.Va. 2008) 585 F.Supp.2d 789, 804.)
Under an objective standard, the court's inquiry focuses on whether a reasonable person would foresee that the speaker's or author's statement would be interpreted by the recipient as a serious expression of intent to inflict bodily harm. (See Fogel v. Collins (9th Cir. 2008) 531 F.3d 824, 831; State v. DeLoreto, supra, 827 A.2d at p. 680.) The objective standard is sometimes called the "reasonable recipient" standard. (See U.S. v. Parr (7th Cir. 2008) 545 F.3d 491, 499; U.S. v. Fulmer (1st Cir. 1997) 108 F.3d 1486, 1491.) Some courts, however, apply a subjective standard. Under that approach, a true threat requires proof that the speaker or author intended the speech as a threat of bodily harm. (See Fogel v. Collins, supra, 531 F.3d at pp. 831-833; U.S. v. Parr, supra, 545 F.3d at pp. 498-502.) "[T]he true threat determination is informed by but not limited to what the recipient or target of the alleged threat knew about the defendant. Contextual information especially aspects of a defendant's background that have a bearing on whether his statements might reasonably be interpreted as a threatis relevant and potentially admissible regardless of whether the recipient or targeted victim had full access to that information." (U.S. v. Parr, supra, 545 F.3d at p. 502.) The subjective standard may appropriately be called the "actual intent" standard. (See U.S. v. Patillo (4th Cir. 1970) 431 F.2d 293, 298, affd. on rehg. en banc (4th Cir. 1971) 438 F.2d 13; U.S. v. Ogren (C.A.A.F. 2001) 54 M.J. 481, 486.)
Federal courts are divided on whether the applicable standard should be objective or subjective. (See U.S. v. Parr, supra, 545 F.3d at pp. 498-500 & fn. 2; State v. Johnston (2006) 156 Wn.2d 355, fn. 5 [127 P.3d 707, 710].) This split of authority is attributable to the Supreme Court's decision in Virginia v. Black, supra, 538 U.S. 343, and has been acknowledged in *1214 California (see Levin v. United Air Lines, Inc. (2008) 158 Cal.App.4th 1002, 1019, fn. 21 [70 Cal.Rptr.3d 535]). But our courts have not resolved the issue. (Compare In re M.S. (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365] ["When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection."] and USS-Posco Industries v. Edwards (2003) 111 Cal.App.4th 436, 444-446 [4 Cal.Rptr.3d 54] [1st Amend. does not protect threats that cause listeners to fear for their safety] with Levin v. United Air Lines, Inc., supra, at pp. 1019-1025 & fn. 21 [noting split of authority but declining to resolve issue where plaintiff who brought suit for false imprisonment had been arrested for making false bomb report, not threat of bodily harm].) We need not decide which standard is the correct one because we apply both of them. (See pt. II.B, post; Fogel v. Collins, supra, 531 F.3d at p. 831.)

2. Public Issue

The anti-SLAPP statute applies where "[a] cause of action against a person aris[es] from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1), italics added.)
(7) As used in the statute, "`act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e), italics added; see Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1117-1118, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564] [discussing types of statements covered by anti-SLAPP statute].) The R.'s contend that plaintiffs' complaint falls within the third clause of section 425.16, subdivision (e).
(8) The anti-SLAPP statute contains no definition of "public issue" or "public interest." That might be attributable to an assumption that "`"no standards are necessary because [judges and attorneys] will, or should, know *1215 a public concern when they see it."'" (Briggs v. Eden Council for Hope & Opportunity, supra, 19 Cal.4th at p. 1122, fn. 9; see Du Charme v. International Brotherhood of Electrical Workers (2003) 110 Cal.App.4th 107, 117 [1 Cal.Rptr.3d 501].)
"`"The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liabilityand whether that activity constitutes protected speech or petitioning." . . .'" (Feldman v. 1100 Park Lane Associates (2008) 160 Cal.App.4th 1467, 1478 [74 Cal.Rptr.3d 1], citation omitted; accord, Navellier v. Sletten (2002) 29 Cal.4th 82, 91-93 [124 Cal.Rptr.2d 530, 52 P.3d 703].)
"`"The definition of `public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. . . ." . . . "Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." . . .'" (Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP (2007) 146 Cal.App.4th 841, 846 [53 Cal.Rptr.3d 256], citations omitted; accord, Damon v. Ocean Hills Journalism Club (2000) 85 Cal.App.4th 468, 479 [102 Cal.Rptr.2d 205].)
(9) In general, "[a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest." (Jewett v. Capital One Bank (2003) 113 Cal.App.4th 805, 814 [6 Cal.Rptr.3d 675]; accord, World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc. (2009) 172 Cal.App.4th 1561, 1573 [92 Cal.Rptr.3d 227]; Century 21 Chamberlain & Associates v. Haberman (2009) 173 Cal.App.4th 1, 9 [92 Cal.Rptr.3d 249].) "[T]o satisfy the public issue/issue of public interest requirement in situations where the issue is of interest only to a limited, but definable portion of the public, such as a private group, organization, or community, `the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance.'" (Hailstone v. Martinez (2008) 169 Cal.App.4th 728, 738 [87 Cal.Rptr.3d 347]; accord, World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, at pp. 1572-1573.)
*1216 "`The fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute. . . . By focusing on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based, defendants resort to the oft-rejected, so-called `synecdoche theory of public issue in the anti-SLAPP statute,' where `[t]he part [is considered] synonymous with the greater whole.' . . . In evaluating the first [step] of the anti-SLAPP statute, we must focus on `the specific nature of the speech rather than the generalities that might be abstracted from it. . . .'" (World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at p. 1570, citations omitted; accord, Weinberg v. Feisel (2003) 110 Cal.App.4th 1122, 1132 [2 Cal.Rptr.3d 385]; Commonwealth Energy Corp. v. Investor Data Exchange, Inc. (2003) 110 Cal.App.4th 26, 34 [1 Cal.Rptr.3d 390].)

3. Parties' Burdens on the Motion

(10) "[The anti-SLAPP statute] requires the [trial] court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken `in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers `the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'" (Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685], italics added.)
(11) Put another way, "a defendant seeking to strike a plaintiff's complaint under section 425.16 has the burden of making a prima facie showing that the plaintiff's allegations are subject to that section. . . . Only if the defendant satisfies that burden, will it then fall to the plaintiff to establish the required `probability' of success. . . . The defendant's burden requires that it demonstrate that the plaintiff's cause of action arose from some act of the defendant that was taken in furtherance of the defendant's constitutional rights of petition or free speech." (Gallimore v. State Farm Fire & Casualty Ins. Co. (2002) 102 Cal.App.4th 1388, 1397 [126 Cal.Rptr.2d 560], italics added & omitted, citations omitted; accord, Club Members for an Honest Election v. Sierra Club (2008) 45 Cal.4th 309, 315-316 [86 Cal.Rptr.3d 288, 196 P.3d 1094].)
*1217 "`The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish [his or] her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the [secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.'" (Navellier v. Sletten, supra, 29 Cal.4th at pp. 94-95, italics added; accord, Jarrow Formulas, Inc. v. LaMarche (2003) 31 Cal.4th 728, 740 [3 Cal.Rptr.3d 636, 74 P.3d 737].)
Under the first step, the defendant must make a showing that the complaint is based on protected activity. (See Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at p. 67; World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at p. 1568.) Some courts have described the requisite showing as "prima facie"; some have referred to it as "threshold"; and some have used "prima facie" and "threshold" interchangeably. (See, e.g., Rezec v. Sony Pictures Entertainment, Inc. (2004) 116 Cal.App.4th 135, 139 [10 Cal.Rptr.3d 333] [prima facie showing]; Manhattan Loft, LLC v. Mercury Liquors, Inc. (2009) 173 Cal.App.4th 1040, 1049 [93 Cal.Rptr.3d 457] [same]; Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at p. 67 [threshold showing]; Episcopal Church Cases (2009) 45 Cal.4th 467, 477 [87 Cal.Rptr.3d 275, 198 P.3d 66] [same]; Club Members for an Honest Election v. Sierra Club, supra, 45 Cal.4th at pp. 315-316 [prima facie showing and threshold showing]; Gallimore v. State Farm Fire & Casualty Ins. Co., supra, 102 Cal.App.4th at pp. 1396-1397 [same].) The term "prima facie" can be a source of confusion because it has several meanings. (See, e.g., Koch v. Specialized Care Services, Inc. (D.Md. 2005) 437 F.Supp.2d 362, 378-380; Dolan v. Powers (Mo.Ct.App. 2008) 260 S.W.3d 376, 385; Berry v. State (Fla.Dist.Ct.App. 1984) 453 So.2d 197, 198; In re Napp Technologies, Inc. (2000) 338 N.J. Super. 176 [768 A.2d 274, 279 & fn. 3]; Black's Law Dict. (8th ed. 2004) p. 1228, cols. 1, 2 [defining "prima facie" and "prima facie case"].) The anti-SLAPP statute itself does not use either "prima facie" or "threshold," but simply states that "[a] cause of action" is "subject to a special motion to strike" if it "aris[es] from any act . . . in furtherance of the person's right of petition or free speech . . . in connection with a public issue." (§ 425.16, subd. (b)(1), italics added.) Regardless of whether "prima facie" or "threshold" is the judicially created term of choice, the result should be the same.
(12) Although we "generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address [that] issue in the second step of the analysis, if necessary" (Chavez v. Mendoza (2001) 94 Cal.App.4th 1083, 1089 [114 Cal.Rptr.2d 825]), the general presumption is not appropriate where, as here, the "statement or writing" (§ 425.16, subd. (e)(3)), on its face, is a threat of bodily harm, and all of the causes of action are based on the same statement or writing.
*1218 (13) Accordingly, to prevail on the first step under the anti-SLAPP analysis, the R.'s must demonstrate that R.R.'s posted message is protected speech and that it was made in connection with a public issue. We conclude the R.'s failed in both respects.

B. Free Speech Under the Anti-SLAPP Statute

(14) As noted, the First Amendment does not protect true threats "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (Virginia v. Black, supra, 538 U.S. at p. 359.) "The speaker need not actually intend to carry out the threat." (Id. at pp. 359-360.) "`A true threat is a serious one, not uttered in jest, idle talk, or political argument.'" (U.S. v. Fuller (7th Cir. 2004) 387 F.3d 643, 646.) The First Amendment protects parody, rhetorical hyperbole, and loose, figurative, or hyperbolic language. (Lam v. Ngo (2001) 91 Cal.App.4th 832, 849 [111 Cal.Rptr.2d 582]; Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1, 21 [111 L.Ed.2d 1, 110 S.Ct. 2695]; Hustler Magazine v. Falwell (1988) 485 U.S. 46, 51, 56 [99 L.Ed.2d 41, 108 S.Ct. 876].)
As a preliminary matter, we note that "[o]nline bullying, called cyberbullying, happens when teens use the Internet, cell phones, or other devices to send or post text or images intended to hurt or embarrass another person. [¶] . . . [¶] Contrary to what cyberbullies may believe, cyberbullying is a big deal, and can cause a variety of reactions in teens. . . . [¶] . . . [¶] Many youth experience a variety of emotions when they are cyberbullied. Youth who are cyberbullied report feeling angry, hurt, embarrassed, or scared." (National Crime Prevention Council, Cyberbullying [as of Mar. 15, 2010].) "Children have killed each other and committed suicide after having been involved in a cyberbullying incident. [¶] Cyberbullying is usually not a one time communication, unless it involves a death threat or a credible threat of serious bodily harm." (Stop Cyberbullying [as of Mar. 15, 2010].) "In studies of middle and high school students, . . . the most common way that children and youth reported being cyberbullied was through instant messaging. Somewhat less common ways involved the use of chat rooms, emails, and messages posted on Web sites." (Cyberbullying [as of Mar. 15, 2010], italics added, citation omitted.)
"Cyberbullying has increased in recent years. In nationally representative surveys of 10-17 year-olds, twice as many children and youth indicated that they had been victims and perpetrators of online harassment in 2005 compared with 1999/2000 . . . ." (Cyberbullying [as of Mar. 15, 2010].)

*1219 1. Reasonable Recipient Standard

Under the objective standard for true threats, we begin our analysis with the text of R.R.'s posted message: "Hey [D.C.], I want to rip out your fucking heart and feed it to you. I heard your song while driving my kid to school and from that moment on I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell."
This message is unequivocal. A serious expression of intent to inflict bodily harm is conveyed no less than three times by the phrases "rip out your fucking heart," "want[] to kill you," and "pound your head in with an ice pick." That these words produce grotesque and exaggerated images does not lessen the gravity of the threat. An intent to harm the recipient is also shown by the use of "fuck you," "burn in hell," and "dick-riding penis lover," indicating that the author is angry. The message does not even hint that it is the result of the author's reaction to the recipient's Web site.
The threat in this case was not merely a few words shouted during a brawl; it was a series of grammatically correct sentences composed at a computer keyboard over a period of at least several minutes. Even after the message was typed, the author still had to decide whether to send it. He placed his cursor over "send" and clicked the mouse or touchpad. Thus, the content of the message and its transmission show deliberation on the part of the author.
(15) The R.'s contend that the reference to the use of an ice pick and the biological impossibility of eating one's own heart make clear that the message was a joke. They also argue that, on its face, the message indicates that the underlying motivation was a dislike of the recipient's song, not his perceived sexual orientation. These contentions are unpersuasive or irrelevant. The true threat analysis does not require that a speaker intend to inflict bodily harm in the precise manner described in a threat. Nor does the speaker have to intend to kill his victim. Rather, if the threat conveys a serious expression of an intent to inflict bodily harm at all or in any manner, it is not constitutionally protected. Further, a reasonable person would not interpret the threat here as being motivated by a dislike of the recipient's song. That a one-time hearing of a song on the radio could generate so vitriolic a reaction defies reason. Moreover, this was a threat made by a high school student to a fellow student. Was it reasonably foreseeable to the teenage speaker that the message would be interpreted by another teenager as a threat of bodily harm? We think so. A high school bully might well use similar words. In addition, the true threat analysis focuses on intent, not motive. Whether a misperception of D.C.'s sexual orientation motivated R.R. is relevant in determining liability under the hate crimes statutes (see Civ. Code, §§ 51.7, 52.1) but not in resolving the First Amendment issue.
*1220 Other evidence supports the conclusion that a reasonable person would foresee that R.R.'s message would be viewed as a threat of bodily harm. D.C.'s father closed down the Web site immediately upon seeing the derogatory and threatening posts and contacted the police. The police thought it prudent that D.C. not return to Harvard-Westlake until their investigation was completed and so advised D.C.'s father. D.C. returned to the school only oncefor a PSAT class under the watchful eye of his father. When the police investigation dragged on, D.C., who was in his junior year, withdrew from Harvard-Westlake to avoid missing more classes. Plaintiffs moved to Northern California, where D.C. attended another school. D.C.'s father had to travel back and forth from the family's new residence to Los Angeles for business purposes.
It was not until sometime after plaintiffs discovered the posts that they learned the names of the students who were responsible. Consequently, the way in which plaintiffs reacted to the posts was not affected by information about the specific characteristics, beliefs, or charitable activities of any of the students. Under a standard of reasonableness, plaintiffs were not required to know that the author of R.R.'s message was in a self-described "playful mood" or that he was an exemplary individual.
Many of the posts at D.C.'s Web site did not constitute threats of any kind, and plaintiffs admit as much, stating that they perceived only six of the 34 derogatory posts as serious threats of bodily harm. That the majority of posts may have been nonthreatening does not lessen the effect of R.R.'s post. The law did not obligate plaintiffs to view all of the posts as having the same purpose or intent. In the opinion of D.C.'s father: "[R.R.'s message] was the most evil and malicious of the postings and looked to come from a parent rather than a student. My family was terrified and made physically nauseous from the threat." Accordingly, plaintiffs sued only six students.
The R.'s emphasize that D.C. did not see the messages posted at the Web site. That is beside the point. He subsequently learned about the messages and reacted with fear for his own safety, eventually requiring medical attention for panic attacks. "[A] prohibition on true threats `protect[s] individuals from the fear of violence' and `from the disruption that fear engenders,' in addition to protecting people `from the possibility that the threatened violence will occur.'" (Virginia v. Black, supra, 538 U.S. at p. 360.) Similarly, that students other than R.R. found the posts as a whole to be funny or amusing does not suggest how plaintiffs should have viewed R.R.'s post in particular.
As reported by his father, D.C. was approached by people who "discuss[ed] what was posted and asked [D.C.] about being gay. It was clear that others [who] read the posts believed the comments about his sexual orientation and felt concern for him and his safety." (Italics added.)
*1221 Thus, a reasonable person would foresee that R.R.'s post would be interpreted by D.C. and his parents as a serious expression of an intent to inflict bodily harm. It follows that the R.'s failed to make a sufficient showing of First Amendment protection under an objective standard for identifying true threats.

2. Actual Intent Standard

Under the subjective standard, we first examine the content of R.R.'s post, as recited verbatim in his declaration: "`Hey [D.C.], I want to rip out your fucking heart and feed it to you. I heard your song while driving my kid to school and from that moment on I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell.'"
On its face, this post would not support a finding of jocular intent. The tone is serious, not humorous. The message describes violent conduct the author "wants" to commit, expresses the author's feelings of anger and hatred, and indicates the author will physically attack the recipient if he ever sees him. The content of the message shows it was written with deliberation. An intent to harm is evident.
For their part, the R.'s rely primarily on the evidence in the declarations of R.R. and his father describing R.R.'s good character and conduct on other occasions and with respect to other people. But R.R. also stated in his declaration that, when he posted the message, he was attempting "to win the one-upmanship contest that was tacitly taking place," and, after posting the message, he felt "ashamed" he had allowed "the desire for peer approval, `peer pressure,' to induce [him] into acting like an idiot."
As our Supreme Court commented in recognizing the need to supervise high school students: "Supervision . . . is required, in part, so that discipline may be maintained and student conduct regulated. Such regulation is necessary precisely because of the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm. High school students may appear to be generally less hyperactive and more capable of self-control than grammar school children. Consequently, less rigorous and intrusive methods of supervision may be required. Nevertheless, adolescent high school students are not adults and should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity. . . . `[W]e should not close our eyes to the fact that . . . boys of seventeen and eighteen years of age, particularly in groups where the herd instinct and competitive spirit tend naturally to relax *1222 vigilance, are not accustomed to exercise the same amount of care for their own safety as persons of more mature years.'" (Dailey v. Los Angeles Unified Sch. Dist. (1970) 2 Cal.3d 741, 748 [87 Cal.Rptr. 376, 470 P.2d 360], fn. omitted.) R.R.'s declaration suggests he succumbed to a "`herd instinct' ""the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm." (Ibid., italics added.) It is irrelevant, for First Amendment purposes, that R.R. may not have intended to carry out his threat. (See Virginia v. Black, supra, 538 U.S. at pp. 359-360.)
(16) Even assuming R.R. believed that his message was humorous, he may still have intended it as a threat. Self-amusement and wrongful conduct are not mutually exclusive. As explained by the National Crime Prevention Council: "Cyberbullying is a problem that affects almost half of all American teens. . . . [¶] . . . [¶] When teens were asked why they think others cyberbully, 81 percent said that cyberbullies think it's funny." (National Crime Prevention Council, Cyberbullying [as of Mar. 15, 2010], italics added.) "`[T]he peculiar sense of humor attributable to this defendant does not lessen the seriousness of the legal consequences of his acts.'" (State ex rel. RT (La. 2001) 781 So.2d 1239, 1245, fn. 9.) "[I]ndividuals of a completely distorted sense of humor or pranksters with juvenile minds have . . . induced fear by [their] acts." (Ibid.; accord, U.S. v. Silver (E.D.Pa. 1961) 196 F.Supp. 677, 678.) "[W]e reject [R.R.'s] argument that his statements were not `true threats' because they were merely `jests to show toughness and to establish a position among other [students].'" (U.S. v. Stewart (9th Cir. 2005) 420 F.3d 1007, 1019, fn. 9.)
Further, the actions taken by R.R.'s parents in response to his message contradict the assertion that R.R. intended to play a mere joke. They terminated his access to the Internet, grounded him, prohibited his use of cell phones except for emergencies, and took away his driving privileges. They had him evaluated by a psychiatrist to ensure his "conduct was never repeated and the root cause, if any, was dealt with immediately." (Italics added.) This evidence suggests that R.R.'s parents thought the "root cause" of his behavior was something other than his sense of humor.
Under the subjective standard, we inquire into whether R.R. intended that his message be interpreted as a threat. (See Fogel v. Collins, supra, 531 F.3d at pp. 831-833; U.S. v. Parr, supra, 545 F.3d at pp. 498-502.) The message itself implies he did. His statements about one-upmanship, peer pressure, and idiocy imply he did. The actions of his parents imply he did. The statements about his jocular intent, good character, and specific behavior on other occasions imply he did not. Thus, the R.'s have presented conflicting evidence on the subject of intent. It is a conflict borne of self-contradiction: *1223 The material facts and inferences drawn from portions of R.R.'s and his father's declarations are inconsistent with the material facts and inferences drawn from other portions of the same declarations. Because we cannot weigh the R.'s evidence, we cannot resolve the conflicts.
We therefore conclude that the R.'s did not make a sufficient showing of protected speech under the subjective standard of the true threat analysis. (See, e.g., In re Holm (9th Cir. 1991) 931 F.2d 620, 623 [creditor's claim in bankruptcy is prima facie valid if it sets forth necessary facts without self-contradiction]; City of Colorado Springs v. Forance (Colo. 1989) 776 P.2d 1107, 1110-1111 [defendant's conflicting evidence failed to establish prima facie case]; Center Candy, Inc. v. CJB Food Mart, Inc. (N.Y.App.Dist. 2008) 50 A.D.3d 723, 724 [854 N.Y.S.2d 317, 318] [plaintiff failed to establish prima facie case based on conflicting evidence]; Mohan v. Westchester County Medical Center (N.Y.App.Dist. 1988) 145 A.D.2d 474, 475 [535 N.Y.S.2d 431, 432] [difference of opinion among experts does not provide basis for prima facie case of medical malpractice]; King v. Brasington (1984) 252 Ga. 109 [312 S.E.2d 111, 112-113] [self-contradictory evidence failed to establish prima facie case]; Jones v. Sears Roebuck & Co. (1977) 80 Wis.2d 321 [259 N.W.2d 70, 72] [defendant moving for summary judgment fails to establish prima facie defense if undisputed facts give rise to conflicting inferences]; Metromedia, Inc. v. Mandel (N.Y.App.Dist. 1964) 21 A.D.2d 219, 222-223 [249 N.Y.S.2d 806, 809-810] [conflicting assertions as to defendants' motive and intent precluded plaintiff from establishing prima facie tort], affd. (N.Y. 1964) 15 N.Y.2d 616 [255 N.Y.S.2d 660, 203 N.E.2d 914]; Boyas v. Raymond (1939) 302 Mass. 519 [20 N.E.2d 411, 412] [where two pieces of evidence are, by statute, to be given prima facie effect but that evidence is conflicting, no prima facie effect is given]; Kilgore v. Gannon (1916) 185 Ind. 682 [114 N.E. 446, 448] [prima facie presumption of testator's soundness of mind, which arises from probate of will, does not apply where evidence of testator's sanity is in conflict].)
(17) Our conclusion under both the objective and subjective standards is compelled in part by the purpose of the first step in the anti-SLAPP analysisto determine whether "the operative complaint is `within the class of suits subject' to the special motion to strike procedure." (Brill Media Co., LLC v. TCW Group, Inc. (2005) 132 Cal.App.4th 324, 331 [33 Cal.Rptr.3d 371], italics added; see id. at pp. 329-331.) If a complaint is subject to the anti-SLAPP statute, that is, if the defendant makes the requisite showing that the complaint is based on protected speech or petitioning activity, the plaintiff must then offer evidence, typically at the pleading stage, to demonstrate a probability of prevailing on the merits. (Id. at p. 328; see § 425.16, subds. (f), (g) [anti-SLAPP motion should be filed within 60 days of service of *1224 complaint unless court permits otherwise; upon filing notice of motion, all discovery is stayed].) If the plaintiff fails in that regard, the complaint is dismissed and the plaintiff is liable for the defendant's attorney fees. (See § 425.16, subd. (c).) Thus, the two steps serve different purposes: The first step determines whether the complaint comes within the scope of the anti-SLAPP statute (see Flatley v. Mauro, supra, 39 Cal.4th at pp. 313-318; Navarro v. IHOP Properties, Inc. (2005) 134 Cal.App.4th 834, 843 [36 Cal.Rptr.3d 385]), while the second step ensures "`that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited'" (Wilson v. Parker, Covert & Chidester (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733]).
(18) In a case alleging statutory hate crimes and related common law claims, the courts should ensure that the anti-SLAPP statute does not discourage victims from seeking relief. That undesired effect would be likely if (1) the communication at issue appears on its face to be an intentional threat of bodily harm and was reasonably interpreted as such by the recipient, but (2) the trial court, in ruling on an anti-SLAPP motion, concludes the defendant has satisfied the first step of the analysis based on conflicting evidence of intent. If the defendant's burden at the first step were so easily met in a case like this one, victims would often be put to the task, early in the litigation, of proving a probability of success on the merits. "`These [would be] . . . grossly unfair burdens to impose on a plaintiff who is himself the victim of the defendant's [wrongful] activity.'" (Flatley v. Mauro, supra, 39 Cal.4th at p. 318.) And efforts to enforce the hate crimes laws would be chilled. (See San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn. (2004) 125 Cal.App.4th 343, 357-358 [22 Cal.Rptr.3d 724] [if plaintiffs who challenge governmental conduct were routinely subject to anti-SLAPP motions and required to show merit at the pleading stage, their use of petitions for writ of mandate to review legislative and administrative decisions would be chilled].)
(19) We do not suggest that R.R.'s message was illegal as a matter of law. (See Flatley v. Mauro, supra, 39 Cal.4th at p. 317 [anti-SLAPP statute "cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition"].) Nor do we require the R.'s to show as a matter of law that R.R.'s message was protected speech. (See id. at pp. 314, 319-320; Soukup v. Law Offices of Herbert Hafif (2006) 39 Cal.4th 260, 286 [46 Cal.Rptr.3d 638, 139 P.3d 30].) Nevertheless, "it would eviscerate the first step of the two-step inquiry set forth in the statute if the defendant's mere assertion that his underlying activity was constitutionally *1225 protected sufficed to shift the burden to the plaintiff to establish a probability of prevailing . . . . While a defendant need only make a prima facie showing that the underlying activity falls within the ambit of the statute, clearly the statute envisions that the courts do more than simply rubberstamp such assertions before moving on to the second step. . . . `[I]t is fundamentally fair that before putting the plaintiff to the burden of establishing probability of success on the merits the defendant be required to show imposing that burden is justified by the nature of the plaintiff's complaint.'" (Flatley, at pp. 317-318, citation omitted.) "[T]he plaintiff . . . has no obligation to demonstrate [a] probability of success if the defendant fails to meet [his] threshold burden [at the first step]." (Gallimore v. State Farm Fire & Casualty Ins. Co., supra, 102 Cal.App.4th at p. 1396.)
Where a plaintiff seeks relief based on a threat of bodily harm, the author of the threat should not be able to satisfy his burden under the anti-SLAPP statute by talking out of both sides of his mouth. The courts should apply the statute to protect the rights of free speech and petition (see § 425.16, subd. (b)(1)), not to chill the pursuit of claims under the hate crimes laws and the common law.
Finally, in applying the First Amendment, we do not defer to the legal conclusions of the parties or other persons on that subject. (See In re George T. (2004) 33 Cal.4th 620, 632-634 [16 Cal.Rptr.3d 61, 93 P.3d 1007].) For example, the decisions of the LAPD and the district attorney's office are not controlling under the true threat analysis. Further, those decisions related to a criminal investigation ending in no prosecution while the present case concerns civil liability. Although plaintiffs' statutory claim is denominated one for hate crimes, their cause of action is based on statutes imposing civil liability. (See Civ. Code, §§ 51.7, 52.1.)
Nothing we have said will chill free speech. We have not suggested the R.'s will be found liable on any of plaintiffs' causes of action. A trier of fact may ultimately find that R.R.'s message was not a true threat. The narrow question on appeal is whether the R.'s may rely on the First Amendment to dismiss this lawsuit by way of an anti-SLAPP motion. As discussed, they may not. (See Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc. (2005) 129 Cal.App.4th 1228, 1250-1258 [29 Cal.Rptr.3d 521] [where plaintiffs' harassment claim was based on reports posted by defendants on Web site, anti-SLAPP motion was properly denied because 1st Amend, does not protect credible threats of violence].)
In sum, in light of the allegations in the complaint and the evidence submitted by both sides, the R.'s did not demonstrate that R.R.'s message was *1226 protected by the First Amendment. In statutory terms, the R.'s failed to show that plaintiffs' causes of action "aris[e] from any act . . . in furtherance of the [R.'s] right of . . . free speech." (§ 425.16, subd. (b)(1).)

C. Public Issue Under the Anti-SLAPP Statute

In attempting to meet the statutory requirement that the complaint arise from speech made in connection with a public issue, the R.'s contend that D.C. was a "public figure" or a "limited public figure" and that anything said publicly about such a person necessarily involves a public issue. We conclude the complaint does not involve a public issue.
(20) "`Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute.'" (Nygård, Inc. v. Uusi-Kerttula (2008) 159 Cal.App.4th 1027, 1039 [72 Cal.Rptr.3d 210], italics added; accord, Barrett v. Rosenthal (2006) 40 Cal.4th 33, 41, fn. 4 [51 Cal.Rptr.3d 55, 146 P.3d 510].) But not every Web site post involves a public issue. (See § 425.16, subd. (e)(3) [requiring that speech be made in a public forum and in connection with an issue of public interest].) "[M]ere publication . . . on a Web site . . . should not turn otherwise private information . . . into a matter of public interest." (Du Charme v. International Brotherhood of Electrical Workers, supra, 110 Cal.App.4th at p. 117.)
(21) No authority supports the R.'s broad proposition that anything said or written about a public figure or limited public figure in a public forum involves a public issue. Rather, as stated, the California cases establish that generally, "[a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest." (Jewett v. Capital One Bank, supra, 113 Cal.App.4th at p. 814; see World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at p. 1573; Century 21 Chamberlain & Associates v. Haberman, supra, 173 Cal.App.4th at p. 9.) And where the issue is of interest to only a private group, organization, or community, the protected activity must occur in the context of an ongoing controversy, dispute, or discussion, such that its protection would encourage participation in matters of public significance. (Hailstone v. Martinez, supra, 169 Cal.App.4th at p. 738; World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at pp. 1572-1573.) None of those factors applies here.
In Nygård, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th 1027, a former employee of Nygård, Inc., and Nygård International Partnership gave an interview to a Finnish magazine about his work experiences. The resulting *1227 article included negative comments about the companies' founder and chairman of the board, Peter Nygård. The companies filed suit against the magazine in California and were met with an anti-SLAPP motion. The trial court found that the magazine had satisfied the first step of the statutory analysis "because [the] evidence showed that the [employer] and its founder, Nygård, `are internationally known public figures who spend a great deal of money and effort to promote their business, success, wealth and lifestyle.' Further, [Nygård's companies] employ over 12,000 employees worldwide. Thus, the court said, the statements . . . published by the magazine involved highly visible public figures and issues of public interest." (Id. at p. 1034.)
The Court of Appeal affirmed for different reasons, explaining: "[The] cases and the legislative history . . . suggest that `an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is any issue in which the public is interested. In other words, the issue need not be `significant' to be protected by the anti-SLAPP statuteit is enough that it is one in which the public takes an interest. Judged by this standard, the trial court correctly concluded that the statements on which the present suit is based concern an issue of public interest. According to evidence introduced by defendants in support of their motions to strike, there is `extensive interest' in Nygård`a prominent businessman and celebrity of Finnish extraction'among the Finnish public. Further, defendants' evidence suggests that there is particular interest among the magazine's readership in `information having to do with Mr. Nygård's famous Bahamas residence which has been the subject of much publicity in Finland.' The . . . article was intended to satisfy that interest." (Nygård, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th at p. 1042, italics added & omitted.)
"In Seelig v. Infinity Broadcasting Corp. (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] . . ., the plaintiff was one of 50 contestants in the television program Who Wants to Marry a Multimillionaire . . . . A San Francisco radio show mocked the plaintiff's participation in the show, and the plaintiff sued the radio station for slander and other torts. . . . The Court of Appeal held that the suit was subject to a special motion to strike. Among other things, it held that the offending comments were made `"in connection with an issue of public interest"': `The offending comments arose in the context of an on-air discussion between the talk-radio cohosts and their on-air producer about a television show of significant interest to the public and the media. This program was a derivative of Who Wants to Be a Millionaire, which had proven successful in generating viewership and advertising revenue . . . . By having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media.' . . .
*1228 "The court reached a similar result in Sipple v. Foundation for Nat. Progress (1999) 71 Cal.App.4th 226 [83 Cal.Rptr.2d 677]. There, the plaintiff[, Donald Sipple,] was a nationally known political consultant who had developed advertising campaigns for major political candidates. . . . He brought a suit for defamation and other torts after the defendant . . . published an article about a custody dispute between Sipple and his second wife. Among other things, the article discussed Sipple's first and second wives' testimony at the custody trial that he had physically and verbally abused them. . . . The trial court struck the complaint under the anti-SLAPP statute and the Court of Appeal affirmed, holding that the article concerned a matter of public interest. It [stated]: `Central to the article . . . are the allegations of physical and verbal abuse against a prominent media strategist by two former wives . . . . In 1994, appellant devised media strategy based on genderbased advertising against domestic violence for the gubernatorial races of Pete Wilson in California, George W. Bush in Texas and Jim Edgar in Illinois. Ironically, the custody dispute occurred while appellant was running the media strategy for Bob Dole's 1996 presidential campaign based on morality issues. In other words, appellant was able to capitalize on domestic violence issues in order to further his career.' . . . Accordingly, the court concluded, `[T]he details of appellant's career and appellant's ability to capitalize on domestic violence issues in his advertising campaigns for politicians known around the world, while allegedly committing violence against his former wives, are public issues, and the article is subject to the protection of section 425.16.'" (Nygård, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th at pp. 1042-1043, citations omitted, italics added.)
And in Hall v. Time Warner, Inc. (2007) 153 Cal.App.4th 1337 [63 Cal.Rptr.3d 798], the Court of Appeal held that the producers of a television program could not be sued for airing an interview with Marlon Brando's housekeeper, Blanche Hall, who was named as a beneficiary in Brando's living trust. The court concluded that the anti-SLAPP statute barred suit, stating: "The public's fascination with Brando and widespread public interest in his personal life made Brando's decisions concerning the distribution of his assets a public issue or an issue of public interest. Although Hall was a private person and may not have voluntarily sought publicity or to comment publicly on Brando's will, she nevertheless became involved in an issue of public interest by virtue of being named in Brando's will. Defendants' television broadcast contributed to the public discussion of the issue by identifying Hall as a beneficiary and showing her on camera." (Id. at p. 1347, italics added.)
As noted, "[i]n evaluating the first [step] of the anti-SLAPP statute, we must focus on `the specific nature of the speech rather than the generalities that might be abstracted from it. . . .'" (World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at p. 1570.) Here, *1229 the R.'s liability is premised on a Web site message from one teenager to another. The message does not mention a public issue. Rather, it combines a threat of bodily harm with derogatory language.
Further, the public was not fascinated with D.C., nor was there widespread public interest in his personal life. There is no evidence that he was a nationally known singer or actor even under his pseudonym, Danny Alexander. Indeed, R.R. stated in his declaration that, before seeing D.C.'s Web site, "I had not heard anything about [D.C.] I had no knowledge of his acting or singing involvement [and] did not know his interests or habits . . . ." In short, D.C. was no Brando.
Admittedly, as alleged in the complaint, D.C. had a record album with a planned release date, had broadcast a song worldwide via satellite radio, and had played the leading role in a feature film presented at an internationally acclaimed film festival. He had also toured under the auspices of a nationally recognized radio network. But unlike the defendants in other cases (see Nygård, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th at p. 1042; Sipple v. Foundation for Nat. Progress, supra, 71 Cal.App.4th pp. 231-234, 239-240; Seelig v. Infinity Broadcasting Corp., supra, 97 Cal.App.4th at pp. 801, fn. 1, 807, fn. 5), the R.'s did not offer any evidence to show that plaintiff here, D.C.was known to the public or was in the public eye. D.C.'s use of a Web site in pursuing an entertainment career did not, ipso facto, put him in the public eye. Millions of teenagers use MySpace, Facebook, and YouTube to display their interests and talents, but the posting of that information hardly makes them celebrities. In addition, D.C.'s record album was released after the posting of the messages, so it did not create any public interest in him at the relevant time. Similarly, the film in which D.C. had the lead, Steal Me, had not yet been released. Absent evidence on the point, we cannot say that, as of the date of R.R.'s message, D.C.'s stint in entertainment had garnered public attention.
As the R.'s would have it, R.R.'s message, like the rest of the posted messages, was part of a joke played on D.C. by other teenagers. Assuming the message was a joke, it did not implicate a public issue. (See Polish American Congress v. F.C.C. (7th Cir. 1975) 520 F.2d 1248, 1250, 1253-1256 [television broadcast of derogatory Polish jokes did not involve a public issue or an issue of public importance]; Shub v. Westchester Community College (S.D.N.Y. 2008) 556 F.Supp.2d 227, 244-246 [professor's comments about college president's inappropriate use of sexual jokes did not relate to an issue of public concern]; Pereira v. Commissioner of Social Services (2000) 432 Mass. 251 [733 N.E.2d 112, 116 & fns. 8, 9, 118-119] [employee's racist joke did not constitute speech on a matter of public concern].)
*1230 Nor is the posted message in this case analogous to a magazine article that discusses a celebrity or to a television interview or radio show about a celebrity. (See Nygård, Inc. v. Uusi-Kerttula, supra, 159 Cal.App.4th 1027 [magazine article]; Sipple v. Foundation for Nat. Progress, supra, 71 Cal.App.4th 226 [magazine article]; Hall v. Time Warner, Inc., supra, 153 Cal.App.4th 1337 [television interview]; Seelig v. Infinity Broadcasting Corp., supra, 97 Cal.App.4th 798 [radio show].) R.R.'s message is devoid of any information about D.C. The message stated in part, "I heard your song while driving my kid to school and from that moment on I've . . . wanted to kill you." But R.R. admitted in his declaration that "[he] obviously didn't have school age children and [he] had never listened to any of [D.C.'s] songs." (Italics added.) Plainly, R.R. did not intend that his message be interpreted as an opinion about D.C.'s singing ability. In contrast to the articles and broadcasts in Nygård, Sipple, Hall, and Seelig, the message in this case was to, not about, a person, and the content of the communication added nothing to any public discourse or interest.
Simply put, R.R.'s message did not concern a person in the public eye, conduct that could directly affect large numbers of people beyond the participants, or a topic of widespread public interest. (See Jewett v. Capital One Bank, supra, 113 Cal.App.4th at p. 814; World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at p. 1573; Century 21 Chamberlain & Associates v. Haberman, supra, 173 Cal.App.4th at p. 9.) And, if the message was of interest to only a private group, organization, or community, it was not part of an ongoing controversy, dispute, or discussion, such that its protection would encourage participation in matters of public significance. (See Hailstone v. Martinez, supra, 169 Cal.App.4th at p. 738; World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc., supra, 172 Cal.App.4th at pp. 1572-1573.)
(22) Finally, it appears that the R.'s have borrowed the term "public figure" from First Amendment jurisprudence. In that context, "[the] designation [of public figure] may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 94 S.Ct. 2997], italics added.) D.C. did not achieve pervasive fame or notoriety, and he was not in the midst of a particular public controversy. (Cf. Carlisle v. Fawcett Publications, Inc. (1962) 201 Cal.App.2d 733 [20 Cal.Rptr. 405] [actress Janet Leigh was a public figure]; Carafano v. Metrosplash.com Inc. (C.D.Cal. 2002) 207 F.Supp.2d 1055, 1070-1072 [actress who had prominent role in Star Trek series and had extensive history of *1231 appearances on television, in motion pictures, and in advertising is a public figure], affd. (9th Cir. 2003) 339 F.3d 1119.)
In conclusion, because the R.'s did not satisfy their burden with respect to the first step of the anti-SLAPP analysis, we do not consider whether plaintiffs demonstrated a probability of prevailing on the merits of their claims. (See City of Cotati v. Cashman (2002) 29 Cal.4th 69, 80-81 [124 Cal.Rptr.2d 519, 52 P.3d 695].) The trial court properly denied the R.'s anti-SLAPP motion.

III

DISPOSITION
The order denying the special motion to strike is affirmed.
Johnson, J., concurred.
ROTHSCHILD, J., Dissenting.
The majority affirms the denial of the anti-SLAPP (strategic lawsuit against public participation) motion on the grounds that R.R.'s post (1) was a "true threat" and therefore was not constitutionally protected, and (2) was not in connection with an issue of public interest. I disagree with both conclusions and with the majority's reasoning, which alters the legal landscape to the severe detriment of First Amendment rights.
In deciding that the post was unprotected, the majority holds defendants to an evidentiary standard that conflicts with controlling California Supreme Court precedent, disregards defendants' evidence on the basis of invalid factual inferences and unsupported legal theories, and ignores the relevant case law by failing to consider the entire factual context in which R.R.'s post occurred. The majority does all of this in the name of protecting hate crime victims (maj. opn., ante, at p. 1224), but the majority acknowledges that because this lawsuit is still at the pleading stage, it may turn out that the suit does not involve a hate crime at all (maj. opn., ante, at pp. 1224, 1225).
I share with the majority the view that R.R.'s post, like many that preceded and followed it, was vulgar, nasty, offensive, and disgusting. But, as Justice Harlan wrote in Cohen v. California (1971) 403 U.S. 15, 24-25 [29 L.Ed.2d 284, 91 S.Ct. 1780], although "the immediate consequence of [free speech rights] may often appear to be only verbal tumult, discord, and even offensive utterance[,] . . . [w]e cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values [of freedom of speech] are truly implicated."
*1232 In concluding that the post was not in connection with an issue of public interest, the majority fails to follow relevant precedent and ignores the substantial evidence that D.C. was a person in the public eye. The majority also creates a broad and groundless exception to the protections of the anti-SLAPP statute, holding that for purposes of the statute, jokes do not constitute communications in connection with issues of public interest. (Maj. opn., ante, at pp. 1199, 1210, 1229.) That is not the law.
Application of the correct legal standards to the relevant facts and evidence demonstrates that defendants have carried their initial burden in support of the special motion to strike. I therefore dissent.

I. The Prima Facie Showing Standard
A defendant bringing an anti-SLAPP motion needs to make only a prima facie showing that the plaintiff's claims arise from constitutionally protected conduct. (See, e.g., Rezec v. Sony Pictures Entertainment, Inc. (2004) 116 Cal.App.4th 135, 139 [10 Cal.Rptr.3d 333].) The moving defendant need only introduce evidence that, if credited, would be sufficient to sustain any factual findings necessary to support the claim of constitutional protection.
The majority mentions the prima facie showing standard but does not actually apply it, instead requiring defendants to show that their conduct is constitutionally protected as a matter of law. The majority's opinion thus conflicts with controlling Supreme Court precedent and alters the law in a manner harmful to First Amendment rights.
"`The Legislature did not intend that in order to invoke the special motion to strike the defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the [secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.'" (Navellier v. Sletten (2002) 29 Cal.4th 82, 94-95 [124 Cal.Rptr.2d 530, 52 P.3d 703] (hereafter Navellier), quoting Fox Searchlight Pictures, Inc. v. Paladino (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906]; see also Soukup v. Law Offices of Herbert Hafif (2006) 39 Cal.4th 260, 286 [46 Cal.Rptr.3d 638, 139 P.3d 30] (hereafter Soukup) ["There is no . . . requirement that the defendant initially demonstrate his or her exercise of constitutional rights of speech or petition was valid as a matter of law."].) "Instead, under the statutory scheme, a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis, and then permit the parties to address the issue in the second step of the analysis, if necessary. [Citation.] Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." (Chavez v. Mendoza (2001) *1233 94 Cal.App.4th 1083, 1089 [114 Cal.Rptr.2d 825]; see also Navellier, supra, 29 Cal.4th at p. 95 [citing with approval this portion of Chavez v. Mendoza]; Governor Gray Davis Com. v. American Taxpayers Alliance (2002) 102 Cal.App.4th 449, 458 [125 Cal.Rptr.2d 534].)
According to California's anti-SLAPP case law, a prima facie showing is merely a presentation of sufficient "facts to sustain a favorable judgment if the evidence submitted [in support of those facts] is credited." (Matson v. Dvorak (1995) 40 Cal.App.4th 539, 548 [46 Cal.Rptr.2d 880]; see Taus v. Loftus (2007) 40 Cal.4th 683, 713-714 [54 Cal.Rptr.3d 775, 151 P.3d 1185]; Soukup, supra, 39 Cal.4th at p. 291; Navellier, supra, 29 Cal.4th at pp. 88-89.) The case law is clear on how a court should determine whether the requisite prima facie showing has been made: The court employs a "summary-judgment-like procedure" (Taus v. Loftus, supra, 40 Cal.4th at p. 714) and "`does not weigh the credibility or comparative probative strength of competing evidence'" (Soukup, supra, 39 Cal.4th at p. 291, italics omitted). (See also Vargas v. City of Salinas (2009) 46 Cal.4th 1, 20 [92 Cal.Rptr.3d 286, 205 P.3d 207]; Zamos v. Stroud (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802]; Jarrow Formulas, Inc. v. LaMarche (2003) 31 Cal.4th 728, 741, fn. 10 [3 Cal.Rptr.3d 636, 74 P.3d 737].) Rather, as long as the record contains "evidence that, if credited, would be sufficient to sustain a favorable judgment" (McGarry v. University of San Diego (2007) 154 Cal.App.4th 97 [108, 64 Cal.Rptr.3d 467]), the prima facie showing standard has been met.[1]
Instead of discussing the California case law explaining what constitutes a prima facie showing in the context of California's anti-SLAPP statute, the majority cites cases from Maryland, Missouri, Florida, and New Jersey for the proposition that the phrase "prima facie" is ambiguous. (Maj. opn., ante, at p. 1217.) Also, although the majority notes that at the first step the moving defendant need only make a prima facie showing of constitutional protection, the majority asserts that "prima facie" is just another way of saying "threshold," adding that "[r]egardless of whether `prima facie' or `threshold' is the judicially created term of choice, the result should be the same." (Maj. opn., ante, at p. 1217.) If the choice of terminology is really of no consequence, however, it is difficult to understand why the majority even brings up the term "threshold." The only apparent explanation is that the majority wants to treat neither "prima facie" nor "threshold" as determining the standard that *1234 the showing must meet. Rather, for the majority the terms "prima facie" and "threshold" indicate only when the showing must be madefor the majority, a "prima facie" or "threshold" showing is simply an initial showing, or a showing made at the beginning. But the question remains: What standard must the moving defendant meet in order to have made the requisite showing? The majority never says.
That gap in the majority's reasoning is particularly troubling because plaintiffs themselves have expressly conceded that defendants' showing was sufficient. In their respondents' brief, plaintiffs state that "[a]s to each of the elements of a `true threat' as defined in [federal case law] . . . there is here conflicting evidence." (Italics added.) That is, plaintiffs concede that defendants have introduced evidence that supports their position on every element of the true threat theory. Thus, according to plaintiffs themselves, defendants have made a prima facie showing that R.R.'s post was not a true threat.
We are not, of course, bound by plaintiffs' concession. Plaintiffs might be wrongthe record might actually contain no evidence sufficient to support defendants' position on the true threat theory. But the majority never says that either. On the contrary, the majority expressly concedes with respect to the subjective test that the record contains "conflicting evidence on the subject of intent." (Maj. opn., ante, at p. 1222.) (The analysis presented in pts. III and IV of this dissent likewise confirms that the record contains sufficient evidence to support defendants' position.) The majority's statement that it has not required defendants "to show as a matter of law that R.R.'s message was protected speech" (maj. opn., ante, at p. 1224) therefore cannot be correctthe majority acknowledges that the record contains sufficient evidence to support defendants' position, but the majority still concludes that defendants' showing was inadequate. It follows that the majority must be requiring something more than a prima facie showing, namely, a demonstration as a matter of law.
In addition, instead of acknowledging that the presence in the record of conflicting evidence establishes that defendants have made a prima facie showing, the majority states that "we cannot resolve the conflicts" in the evidence (maj. opn., ante, at p. 1223), so defendants lose. In determining whether defendants have made a prima facie showing, however, the court should have no occasion to resolve conflicts in the evidencethe court is supposed to employ a "summary-judgment-like procedure" (Taus v. Loftus, supra, 40 Cal.4th at p. 714) and "`does not weigh the credibility or *1235 comparative probative strength of competing evidence'" (Soukup, supra, 39 Cal.4th at p. 291, italics omitted).[2]
I conclude that the majority has in reality required defendants to show that R.R.'s conduct was protected as a matter of law, contrary to the Supreme Court's repeated holdings that no such showing is required. The majority has thus accomplished precisely the "improper shifting of the burdens" that the case law warns against (Chavez v. Mendoza, supra, 94 Cal.App.4th at p. 1089), to the detriment of the free speech rights that Code of Civil Procedure section 425.16 was meant to safeguard.[3]

II. The Subjective Test and the Objective Test
The majority states that "[f]ederal courts are divided on whether the applicable standard [for true threats] should be objective or subjective." (Maj. opn., ante, at p. 1213.) But the subjective test is, in fact, constitutionally required according to a United States Supreme Court case, Virginia v. Black (2003) 538 U.S. 343 [155 L.Ed.2d 535, 123 S.Ct. 1536], which is controlling authority on issues of federal law. (See, e.g., McLaughlin v. Walnut Properties, Inc. (2004) 119 Cal.App.4th 293, 297 [14 Cal.Rptr.3d 369].)
Virginia v. Black involved a First Amendment challenge to a Virginia statute that criminalized cross burning. (Virginia v. Black, supra, 538 U.S. at p. 347.) In the consolidated appeals of three defendants convicted under the statute, the Supreme Court of Virginia held that the statute was unconstitutional on its face, and the United States Supreme Court affirmed in part, vacated in part, and remanded. (Id. at pp. 348, 351, 367-368.) The statute prohibited cross burning only if done "`with the intent of intimidating any person or group of persons,'" but the statute also provided that cross burning itself "`shall be prima facie evidence of an intent to intimidate a person or group of persons.'" (Id. at p. 348.)
The case generated a number of opinions from the justices of the United States Supreme Court. None was joined in its entirety by a majority, although Justice O'Connor's opinion did gain majority support in part and was the plurality opinion as to the remainder. But with the possible exception of Justice Thomas, the differences among the justices did not involve any disagreement about the principle that a "true threat" is unprotected only if it *1236 is made with intent to threaten (that is, with the intent that the communication be taken as a threat). In other words, at least eight of the nine justices agreed that subjective intent to threaten is constitutionally required.
According to the Supreme Court majority, "`[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (Virginia v. Black, supra, 538 U.S. at p. 359, italics added.) Similarly, according to the majority, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." (Id. at p. 360, italics added.) The significance of these statements by the Supreme Court majority is clear: In order for a communication to be an unprotected "true threat," it must have been made with intent to threaten (i.e., the speaker must have subjectively intended that it be taken as a threat).
Examination of the separate opinions of eight of the nine justices bears out that interpretation. The plurality opinion concluded that because the statute allowed the trier of fact to infer intent from the cross burning itself, the statute effectively relieved the government of the burden of proving the defendant's intent and therefore was unconstitutional. (Virginia v. Black, supra, 538 U.S. at pp. 364-365 (plur. opn.) [the statute "strips away the very reason why a State may ban cross burning with the intent to intimidate"].) The separate opinion of Justice Scalia (who was not a member of the plurality) expressly endorsed that principle, observing that the plurality found the statute "constitutionally problematic because `a burning cross is not always intended to intimidate'" and agreeing that "[t]he plurality is correct in all of this . . . ." (Id. at p. 372 (conc. & dis. opn. of Scalia, J.).) Justice Scalia disagreed only with the plurality's facial invalidation of the statute, reasoning that instead the court should have allowed case-by-case challenges to convictions if the statute had in fact operated to relieve the prosecution of its burden to prove intent. (Id. at pp. 372-373 (conc. & dis. opn. of Scalia, J.).) Justice Souter, joined by Justices Kennedy and Ginsburg, likewise agreed that the speaker's subjective intent to intimidate is what makes the conduct "proscribable." (Id. at pp. 385-386 (conc. & dis. opn. of Souter, J.).) Justice Souter disagreed only with the plurality's decision to leave open the possibility that the Virginia courts could, on remand, interpret the statute in such a way as to save it from unconstitutionality (id. at p. 367 (plur. opn.)); in Justice Souter's view, no such saving interpretation was possible (id. at p. 387 (conc. & dis. opn. of Souter, J.)).
Thus, eight justices of the United States Supreme Court (the four-justice plurality, plus Justices Scalia, Souter, Kennedy, and Ginsburg) all agree that *1237 for a true threat to be constitutionally unprotected, it must be made with subjective intent to threaten (i.e., subjective intent that it be taken as a threat), and the Supreme Court's majority opinion defines unprotected true threats as statements in which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence . . ." or speaks "with the intent of placing the victim in fear of bodily harm or death." (Virginia v. Black, supra, 538 U.S. at pp. 359-360.)
I conclude that in order for speech to be an unprotected true threat, the speaker must subjectively intend that the speech be taken as a threat. Only one published federal appellate decision has analyzed Virginia v. Black in detail, and it reached the same conclusion. (U.S. v. Cassel (9th Cir. 2005) 408 F.3d 622, 624, 630-633 ["We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a `true threat' only upon proof that the speaker subjectively intended the speech as a threat."]; see also U.S. v. Magleby (10th Cir. 2005) 420 F.3d 1136, 1139; Ward v. Utah (10th Cir. 2005) 398 F.3d 1239, 1249.)[4] Moreover, in their briefs on appeal, both plaintiffs and defendants take the position that the subjective test is required. According to plaintiffs, "[i]t is the law that a threat cannot be penalized unless it is subjectively intended to intimidate and would put a reasonable person in fear of bodily harm."
Because the subjective test is constitutionally required, this court must first determine whether defendants have made a prima facie showing that R.R.'s *1238 post did not constitute a true threat under that test. If they have, then application of the objective test is irrelevant.

III. Defendants' Evidence and the Self-contradiction Theory
In his declaration filed in support of defendants' anti-SLAPP motion, R.R. explains that he intended the post merely as a joke. If that is true, then he did not intend the post to be taken as a serious expression of intent to commit an act of unlawful violence, so it could not be a true threat under the subjective test. Defendants have therefore made a prima facie showing of constitutional protection, because R.R.'s declaration constitutes "evidence that, if credited, would be sufficient to sustain a favorable [ruling]." (McGarry v. University of San Diego, supra, 154 Cal.App.4th at p. 108.)
As already noted, however, the majority concedes that the record contains "conflicting evidence on the subject of intent" but claims "[i]t is a conflict borne of self-contradiction" which "we cannot resolve," so defendants lose. (Maj. opn., ante, at pp. 1222-1223.) The majority's conclusion thus depends entirely on the validity and application of this self-contradiction theory.
There is indeed a doctrine relating to self-contradiction under California law, but it has nothing to do with this case. "[W]hen discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be tried," a contrary declaration submitted by that party may be disregarded. (D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10] (hereafter D'Amico).) Under the D'Amico rule a party cannot defeat a summary judgment motion by submitting a declaration that retracts the factual admissions that the party made in discovery. "In a nutshell, the rule bars a party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony." (Scalf v. D. B. Log Homes, Inc. (2005) 128 Cal.App.4th 1510, 1522 [27 Cal.Rptr.3d 826].)
That rule has no application here. The self-contradiction rule applies only when one sworn statement contradicts another sworn statement. (See, e.g., Visueta v. General Motors Corp. (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402] [deposition testimony]; Union Bank v. Superior Court (1995) 31 Cal.App.4th 573, 593 [37 Cal.Rptr.2d 653] [interrogatory answers]; Code Civ. Proc., § 2033.410, subd. (a) [responses to requests for admissions].) The record contains no discovery responses or other sworn statements from R.R. admitting that he intended that the post be taken as a threat. His declaration under penalty of perjury that he intended it as a joke therefore does not contradict anything he has previously stated under oath.
*1239 The majority, however, finds "self-contradiction" in three different places: (1) in R.R.'s post, (2) in R.R.'s "statements [in his declaration] about one-upmanship, peer pressure, and idiocy," and (3) in "[t]he actions of [R.R.'s] parents." (Maj. opn., ante, at p. 1222.) The D'Amico rule cannot apply to the post, because it is an unsworn statement. The rule also cannot apply to the actions of R.R.'s parents, because they are unsworn, they are actions rather than statements, and they are not even R.R.'s actions (so they cannot possibly give rise to self-contradiction). But in addition to all of those dispositive problems, the more fundamental failing in the majority's argument is that none of the statements and conduct cited by the majority contradicts R.R.'s sworn declaration that he meant the post as a joke.
The majority contends, to the contrary, that this really is a matter of self-contradiction in sworn statements because "[t]he material facts and inferences drawn from portions of R.R.'s and his father's declarations are inconsistent with the material facts and inferences drawn from other portions of the same declarations." (Maj. opn., ante, at p. 1223.) I disagree for two reasons. First, as a purely procedural matter, unsworn statements and conduct are not transformed into sworn statements merely by being quoted or described in a sworn declaration. R.R.'s post, for example, is an unsworn statement. It does not become a sworn statement merely because R.R. quoted and discussed it in his declaration.[5] The same point applies to R.R.'s parents' prelitigation conduct. Second, as a substantive matter, the insuperable obstacle again confronting the majority's reasoning is that there are no self-contradictions here at all.
R.R.'s father does not contradict himself. He does not say, for example, both that he did and that he did not take R.R. to a psychiatrist, or that R.R. both has and lacks good character. Rather, R.R.'s father says that he took R.R. to a psychiatrist, and the majority infers that R.R.'s father believed R.R. intended the post to be taken as a genuine threat of violence, which according to the majority is "inconsistent" with the evidence R.R.'s father presents concerning R.R.'s good character. But there is absolutely no contradiction or inconsistency here, because the majority's inferences are not the only possible or reasonable inferences. It is perfectly consistent for R.R.'s father to maintain that (1) he took R.R. to a psychiatrist as a result of the post, but (2) he never believed R.R. meant the post to be taken as a genuine threat of violence, and (3) R.R. has engaged in conduct for years that indicates he is a person of good and nonviolent character who holds no negative attitudes towards homosexuals or homosexuality.
*1240 The consistency is obvious. R.R.'s parents punished him and had him evaluated by a psychiatrist, but that does not necessarily mean they believed he intended the post to be interpreted as a genuine threat of violence. Rather, they may have been punishing him for making such an offensive and repulsive joke, and they may have consulted a psychiatrist to learn what could have led their son to make such an offensive and repulsive joke, so that they could "insure that such conduct was never repeated and the root cause, if any, was dealt with immediately." None of this shows that they believed R.R. intended the post to be interpreted as a threat. Moreover, they might have been particularly surprised by R.R.'s having made such an offensive and repulsive joke because, to their knowledge, R.R. had never before "engage[d] in inappropriate verbal behavior" and, on the contrary, had generally exhibited exemplary behavior in the past. Again, there is absolutely no contradiction or inconsistency.
Similar analysis applies to the purported inconsistencies in R.R.'s declaration. The majority infers from R.R.'s "statements about one-upmanship, peer pressure, and idiocy" that R.R. intended his post to be interpreted as a threat (maj. opn., ante, at p. 1222), but no such inference is necessary. On the contrary, those statements are naturally and reasonably read as indicating the opposite. The declaration states that R.R. viewed the posts that preceded his as "jesting," that he believed the authors of the posts were "competing to see who could be the most outrageous," and that he "decided to add [his] own message to the Internet graffiti contest that was apparently going on." The declaration later refers to "one-upmanship" and R.R.'s regrets about having allowed "peer pressure" to make him "act[] like an idiot," but those statements refer back to the "competing" and "contest" that were described earlier in the declaration. They thus are fully consistent with R.R.'s "statements about his jocular intent." (Maj. opn., ante, at p. 1222.) In effect, they confirm that he intended the post not as a threat but rather as an entry in a joke contest, which he idiotically entered as a result of the desire for peer approval. Here too, there is absolutely no contradiction or inconsistency.
On this score, the inferences that the majority draws from R.R.'s "statements about one-upmanship, peer pressure, and idiocy" merit careful scrutiny. First, the majority finds that R.R.'s statements "suggest[] he succumbed to a `"herd instinct."'" (Maj. opn., ante, at p. 1222, quoting Dailey v. Los Angeles Unified Sch. Dist. (1970) 2 Cal.3d 741, 748 [87 Cal.Rptr. 376, 470 P.2d 360] (hereafter Dailey).) Next, the majority claims that the Supreme Court has equated the "herd instinct" with "`the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm.'" (Maj. opn., ante, at p. 1222, italics in maj. opn., quoting Dailey, supra, 2 Cal.3d at p. 748.) Putting it all together, the majority infers that R.R.'s statements about peer pressure show that he was driven by a herd instinct and hence was engaging *1241 in aggressive behavior that exposed his peers to serious physical harm, so he must have intended that his post be taken as a genuine threat of violence, which contradicts his own statements that he intended the post as a joke. (Maj. opn., ante, at pp. 1221-1222 [R.R.'s "statements about one-upmanship, peer pressure, and idiocy imply" that he "intended that his message be interpreted as a threat"].)
The majority's reasoning suffers from the following three defects, each of which is independently dispositive. First, the majority's own quotation from the Supreme Court, read in its entirety, demonstrates that the court did not equate the "herd instinct" with "the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm." (Dailey, supra, 2 Cal.3d at p. 748; see maj. opn., ante, at p. 1222.)
Second, if the majority wants to understand what R.R. meant by "peer pressure," it need look no further than R.R.'s own declaration, which expressly (and correctly) defines it as "the desire for peer approval." The desire for peer approval can lead people (young or old) to do all sorts of things (such as making offensive jokes) that have nothing whatsoever to do with violence, threats of violence, aggression, or risks of physical harm. Consequently, R.R.'s statement that he gave in to peer pressure has no tendency at all to show that he intended his post to be taken as a genuine threat of violence. It shows only that he was motivated by the desire for peer approvalhe wanted to impress his peers by entering a really offensive joke in the offensive joke contest that they were conducting.
Third, even if the Supreme Court had equated the "herd instinct" with "the commonly known tendency of students to engage in aggressive and impulsive behavior which exposes them and their peers to the risk of serious physical harm" (which it did not), and even if R.R. meant to incorporate that definition when using the term "peer pressure" in his declaration (which he did not), that would still have no tendency to show that he intended his post to be taken as a genuine threat of violence, because the definition speaks of the tendency to engage in "aggressive and impulsive behavior" that creates a "risk of serious physical harm." Impulsively chasing a soccer ball into the street, without first looking both ways for oncoming traffic, would be an example of this tendency. That is, the "herd instinct" (or "peer pressure"), so defined, does not necessarily have anything to do with aggressive, threatening, or violent intent.
The majority's "herd instinct" discussion, based on R.R.'s "statements about one-upmanship, peer pressure, and idiocy," is the majority's sole basis for finding that R.R.'s declaration is self-contradictory, which in turn is the *1242 majority's basis for disregarding R.R.'s "statements about his jocular intent." (Maj. opn., ante, at p. 1222.) In reality, there is no contradiction or inconsistency, and hence no self-contradiction, so the entire argument collapses.[6]
As support for its version of the self-contradiction theory, the majority does not cite D'Amico or cases applying it, or any California authorities at all. Instead, the majority cites a Ninth Circuit bankruptcy case and cases from Colorado, New York, Georgia, Wisconsin, Massachusetts (decided in 1939), and Indiana (decided in 1916). (Maj. opn., ante, at p. 1223.) Those authorities, whether taken separately or together, are inadequate to establish a point of California procedural law.
For all of the foregoing reasons, I conclude that the majority's self-contradiction analysis is erroneous and cannot support the majority's conclusion that defendants have failed to make a prima facie showing of constitutional protection under the subjective test. In short, the majority has not shown that R.R.'s post was an unprotected true threat, because the record contains evidence that, if believed by the trier of fact, would demonstrate that the post was not intended as a threat.

IV. The Factual Context and the Objective Test
Under the objective test for true threats, the court must determine "whether it is `reasonably foreseeable . . . to a speaker that the listener will seriously take his communication as an [expression of] intent to inflict bodily harm. This suffices to distinguish a "true threat" from speech that is merely frightening.'" (Fogel v. Collins, supra, 531 F.3d at p. 831, quoting Planned Parenthood v. Amer. Coalition of Life (9th Cir. 2002) 290 F.3d 1058, 1076.) Applying that test, the majority finds that it was indeed reasonably foreseeable that R.R.'s post would be interpreted as an expression of intent to inflict bodily harm. Although I show below that the majority errs in concluding that the post was a true threat under the objective test, I emphasize that even if the majority were correct on this point, the failure of the majority's analysis under the subjective test would still be fatal to its decision.
Although the majority acknowledges that "[a]lleged threats should be considered in light of their entire factual context, including the surrounding *1243 events and reaction of the listeners" (U.S. v. Orozco-Santillan (9th Cir. 1990) 903 F.2d 1262, 1265; see maj. opn., ante, at p. 1213), in applying the objective test for true threats, the majority focuses on the language of R.R.'s individual post and the reaction of D.C.'s parents. (Maj. opn., ante, at pp. 1219-1221.) When R.R.'s post is viewed in light of the entire factual context, however, it becomes clear that no reasonable person would have foreseen that it would be interpreted as a serious expression of intent to inflict bodily harm. At a minimum, applying the prima facie showing standard, the record contains evidence that is sufficient to sustain a ruling in defendants' favor. Thus, under the objective test, defendants should prevail.
Plaintiffs' opposition to the special motion to strike included a declaration by plaintiffs' counsel, to which a number of exhibits were attached. The declaration describes one of the exhibits as "a true and correct copy of sequential posts provided by [plaintiffs] to Harvard-Westlake." All of the quotations in the discussion below are taken from that exhibit, and all typographical and other errors are in the original. It should be emphasized at the outset that one need not find the posts funny, in good taste, or even excusable in order to recognize them as jokes and as protected speech.
The first post is from "dozer" and reads: "i think you are very sexy and i like the way you distinguis between your midnight brown hair and your golden brown eyes. However, your hair is black. Everything at midnight looks black you fool. H." No reasonable person would believe that the author of the post meant to be expressing a genuine belief that D.C. was "very sexy" or that the author genuinely liked the way D.C.'s Web site distinguished between his "midnight brown" hair and his "golden brown" eyes. The post is mocking and farcical from start to finish. It is a joke, and no alternative interpretation is reasonable.
The next post is from "dub": "like dub dozer has already said, i find you extremely good looking. your intro gets me off and you need to update your gallery so i have more pictures to jack off to . . . ill continue to visit this site every free period i have." The post is signed "secret admirer" and concludes "P.S. I am a boy." This post is the first to introduce the theme of homosexuality, though it does not suggest that "Danny Alexander" is gay. Rather, the post mockingly indicates that "Danny Alexander" is very attractive, but to "a boy." Again, it is obviously a joke.
The next post is from "Hoostain": "You are so gosh darn hot! Please meet me on the corner of sunset and bellagio at 1:34 a.m. tonight. You look so great in your pictures by the way. Call me [phone number omitted]. SEXY!!!!" The post is signed "that guy that hates you." Next, from "yourgay@aol.com": "you are a total fag, how does that cock feel in your *1244 butt." Next, from "HW Student": "Everyone knows about this webpage and were never going to live it down AHAHAHAHAHAHAHAHHAHSAHAHAHAHAHAHAHHA"
By this point, the running joke has changed from the suggestion that men are sexually attracted to "Danny Alexander" to the suggestion that "Danny Alexander" is attracted to men. Again, all of the posts are obviously just jokes making fun of "Danny Alexander." No reasonable person would believe, for example, that "Hoostain" (also known as "that guy that hates you") was seriously proposing a rendezvous at Sunset and Bellagio. Nor would a reasonable person conclude that "that guy that hates you" really hates D.C. The entire thread of posts is obviously a farce.[7]
One could reasonably conclude from just those first five posts, however, that at least some of the authors were Harvard-Westlake students. The second post appears to be from a student ("every free period i have"), and the fifth purports to be from "HW Student" and says "Everyone" (presumably everyone at school) "knows about this." At a minimum, the authors of the posts knew that "Danny Alexander" was somehow connected with Harvard-Westlake, and anyone who knew that D.C. was a student there would reasonably infer that the authors of the posts were students there as well. That is indeed the inference that D.C.'s parents correctly drewthey contacted the school the day after discovering the posts on D.C.'s Web site.
The next post is from "Hairy Back of the Legs Man" and reads: "Oh my god! OHHHHHHHHHHH! You are so fucking orgasmic. I'm wet . . . oops i peed my pants. You look exactly like Britney! EXACTLY! Your career is bound to go NOWHERE . . . but up A BUTT! In conclusion, you suck nuts. Have a fruity." After a brief and unintelligible post, the next is from "penewanker": "I am just stunned at how well you have been doing [D.C.]. I can't wait until your first hit single comes out in whenever. I have always known since the day your mom and dad had sex that you or they would be a star. Obviously . . . I was wrong but I still hope you can keep it on the FREAKY SIDE![8] You got what it takes girlfriend . . . shoot your stuff at the world."
Again, the farcical nature of these posts hardly needs to be pointed out. No reasonable reader could have interpreted them as anything but jokes.
*1245 After two inconsequential posts, the next is from "Fuck You Queer Bitch": "Is this kid for serious . . . you take it in the ass just about every minute of every day. Your music sucks and you eat the big wang. Next feature film by this kid is gonna be a gay porno." Next, from "you eat weiner": "BOYS!!! THAT is what you like. i don't get it man . . . on ur website, it says ur name is Danny Alexander, but i thought it was Fruity McGayGay? oh yeah, did i say you like boy penis?" Next, from "You Love Cock": "You are the biggest fag in the hw class of 06 exept for [names omitted], or so we thought. . . . this definetly puts u over the top as undeniabley the biggest cocksucker at hw maybe in the schools history, thank you though . . this will give everyone laguhs for a long long time [D.C.], you're the man (that likes men)." Next, from "[D.C.]smokespole@hotmail.com": "[D.C.], I really enjoy all of your work. You are an inspiration to all and your lyrics are truely amazing. Your loose caboose accounts for your mastry of sword swallowing. I think you should change your name from danny alexander to meat-pole tarzan because you are a man who understands the needs of a man," signed "Fuck you in your fucking fuckhole, me."
Up to this point, there is no denying that all of the posts, however unfunny, sophomoric, and repulsive, are nothing but farce. The next post, from "Disturbed Senior," steps up the level of nastiness: "Hey [D.C.], i was reading some of these posts, and it looks like your off to a great start as far as collecting a fan club goes, your career is going really well . . . anyways i did some research and the bridge that goes over the 405[9] just below mulholland gives you enough height to make a it a quick and nearly painless death . . . i really hope things work out for you . . ." Two more posts follow, from "I HATE FAGS," which simply repeat the words "HEY FUCKER" and "YOU ARE REAL GAY."
The next post, from "DAN JUSTICE," is the first to raise the rhetoric to a level that could, when considered out of context, be construed as a threat. It says "HEY [D.C.], I KNOW A GOOD FAG WHEN I SEE ONE. I LIKE WHAT I SEE, LET'S GO GET SOME COFFEE. faggot im gonna kill you" and is signed "H-W student."
There is no question that the words "faggot i[']m gonna kill you," when considered in isolation, are threatening. But one could say the same thing about the words of the defendant in Watts v. United States (1969) 394 U.S. 705 [22 L.Ed.2d 664, 89 S.Ct. 1399], who was convicted of threatening the life of the President of the United States with the words: "`If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.'" (Id. at p. 706.) The Supreme Court concluded, however, that the statement was mere *1246 "political hyperbole," particularly when considered in light of "the reaction of the listeners," all of whom "laughed after the statement was made." (Id. at pp. 708, 707.)
So how did the audience react to the purported threat from "DAN JUSTICE"? The posts quoted so far indicate that at least some of the authors had read prior posts before writing their own, and later posts confirm that pattern. Moreover, any number of other Harvard-Westlake students who did not post might nonetheless have been reading the thread of posts. How did they all react? Not one of them posted any message of alarm concerning the post. No one said "Did you see that death threat? Somebody better warn [D.C.]," or anything of the kind. Similarly, the record contains no evidence that any Harvard-Westlake students contacted the school's administration to alert them to the purported death threat, even though the thread of posts was obviously being read and at least partially written by Harvard-Westlake students, and even though "DAN JUSTICE" himself (or herself) signed the post "H-W student." Indeed, as noted already, the connection between the posts and Harvard-Westlake students was sufficiently obvious that D.C.'s parents contacted the school the day after discovering the posts. But no one who actually participated in the thread of posts ever manifested any concern that any of the threatening language might be serious. In short, there is no evidence that any writers of any of the posts, or any readers other than D.C.'s parents (and the purported expert witness they have retained in this litigation[10]), perceived it as a genuine threat. Everyone could tell it was a joketasteless, repulsive, and not at all funny, but still a joke.
Accordingly, rather than manifesting any kind of shock, alarm, or even concern, the posts following the one by "DAN JUSTICE" continued the farcical and jesting approach of their predecessors. The next is from "body": "Dear [D.C], Hi!!! im the representative for the student body at harvard westlake, and on behalf of my fellow classmates, I personally feel that it is my duty to tell you how i respond to your life. You, my friend, just might fall under the category of highly unstraight. Not only are you a massive fagmo, but must absolutely quit showing your face at my school. You are now officially wanted dead or alive, and when we find you, we will pounce on that like ur [name omitted]. Bottom line is that you need to be stopped, and if you resist, i will personally unleash my manseed in those golden brown eyes that you value so greatly. I hope you take what I say with the highest regard, and I am looking forward to your death. Thanks." Again, certain hyperbolic *1247 themes are sounded ("quit showing your face at my school," "wanted dead or alive," "I am looking forward to your death"), but the post as a whole makes it clear that it is all a joke. The author is obviously not writing as a representative of the Harvard-Westlake student body and, for example, does not really intend to "unleash [his] manseed" in anyone's eyes if "Danny Alexander" fails "to be stopped." The entire post, however repellant and unfunny, is mere juvenile mockery and absurd rhetoric. Again, no one (other than D.C.'s parents) appeared concerned or alarmed.
The next post purported to be from a woman and states "[D.C.], youre the shit, keep drawing scratch board pics of me in art class . . love you." Next, from "Music Pro": "Hey [D.C.], I'd say by the looks of it, all those `fag' posts were written by the same pitifully untalented pimply-faced loser blow-hole and that you should not let it (meaning the asshole) bother you in the least. Just keep on doing your thing and let the jealous losers rant. He is obviously wishing he had your talent and craving a little man meat himself." Now the joke has gone from (1) men find "Danny Alexander" attractive, to (2) "Danny Alexander" is gay, to (3) the people who are criticizing "Danny Alexander" are gay (and jealous of his talent).
The next four posts all appear to be parodies of fan mail. From "Kandy Kane": "Hi [D.C.]! UR the best! So KOOOL. My friend & I luv ur voice. I so totally don't think you look gay cuz ur so KUTE! UR like one of my favorite singers! Along with Justin, of course. Love, Kandy." From "Mandy": "Hi [D.C.]! I saw you on your disney tour! I can't wait for your next movie to come out. Is is gonna be in real live theatres? Im gonna buy it on video when it comes out. I hope you like hollywood. Maybe Ill move there somedday and be a singer too. I love to sing. Maybe you could give me some ttips one day. Say hi to the boy from sleepover for me. He is really dreamy. but not as dreamy a syou. I love uyou [D.C.]. love mandy (p.s. Is alexander your middle name or your last name? if its your middle name would you please tell me your last name?)" From "eLiZaBeTh": "I LOVE YOU I LOVE YOU." From "MEGHAN": "FREADYSIDE IS MY FAVORITE SONG EVEERRRRR!!!!!!!!!!!!! i LOVE YOU! I REALLY HOPE YOU ARENT REALLY GAY I DONT THINK YOU ARE BUT I THINK YOUR THE BEST. i AGREEE WEITH MANDY I CNAT WAIT FOR YOUR MOVIE TO COME OUT I LOVE YOU I LOVEYOU I LOVE YOU AND I ALSO AGREE WITH THE OTHER PERSOIN WHO SAID THAT ONE GUY WHO SAID ALL THOSE MEAN THINGS IS JEALOUS. IT CANT BE A BUNCH OF DIFFERENT PEOPLE BECAUSE TEY ALL SOUND THE SAME HES SO STUPID DONT LET IT GET TO YOU AT LEAST I LOVE YOU AND A LOT OF MY FFREINDS LIKE YOU A LOT TOO. \I LOVE YOU DISNEY IS SO SMART FOR RECONGINZING YOUR TALENT YOUR SO COOL LOVE LOVE LOOVE YOU [D.C.]"
*1248 The next post continues the theme of mockery through feigned admiration: "seriously [D.C.], you are such an amazing and talented person. i love you so much and when you get sick of singing and acting you should be an artist because you are unbelievable at that too. especially scratch board pictures of [name omitted] and large breasted prostitutes.;-) this weekend we're chilling for sure. love, [name omitted]."
Then, at last, comes a post from an author identified only as "Person," who we now know was R.R.: "Hey [D.C.], I want to rip out your fucking heart and feed it to you. I heard your song while driving my kid to school and from that moment on I've . . . wanted to kill you. If I ever see you I'm . . . going to pound your head in with an ice pick. Fuck you, you dick-riding penis lover. I hope you burn in hell." Like most of the earlier posts, this one is vulgar and repulsive. Although it echoes the purportedly threatening themes found in some earlier posts, it also resembles its predecessors in that it was not reasonably foreseeable that the post would be taken seriously. The author of the post purports to be a father who has wanted to kill "Danny Alexander" ever since hearing his song on the radio. The majority agrees that it would be unreasonable to interpret the post as a genuine threat motivated by dislike of the song, but the majority fails to explain how any interpretation of the post as a genuine threat could be reasonable, given the context in which it occurred.
No subsequent posts manifest any concern or alarm about the purportedly threatening character of R.R.'s post. Again, there is no evidence that anyone (other than D.C.'s parents) thought it necessary to alert the school or the police that D.C. might be in danger. Instead, the posts continue in exactly the same manner as before, joking and making fun of "Danny Alexander."
The next post is from "G-miK": "Your worse than Won-G . . . . you don't have a music video with hot bitches you probably made this site yourself you dont have golden or midnight bullshit eyes it seems like your growing a white-man afro . . . pukeen me salat! (translation: nigga plz!) your juss a silly lil cracka that needs a couple bullets in the chest 50-cent style go eat cock." The next post, from "anonymous-G," continues in a similar vein: "correction pukeen me salat is toss my salad niega pagousta = nigga please but ur still a faggot . . . . i like that call me [phone number omitted] P.S i am a man."
The immediately following posts confirm the complete and incessant lack of seriousness shown throughout the thread of posts. The next post is from "hoo flung pu": "hello sir. i am from the hw gay-straight alliance, and we were wondering where you were on the club day? you didnt sign up like last year . . . were you singing? you have a lovely voice. were you acting? your midnight brown hair is so captivating . . . We missed you! well we all wanted *1249 to know, are you still taking [male name omitted] to semiformal? you two make such a delicious combo! delicious like cock in your mouth, boy. my beard is longer than your dick. asian guys be walkin around like `DAMN HE HAS A SMALL PENIS'."
Next, from "Sorry": "[D.C.], I am that guy who made all of these hate posts. I now realize after reading Music Pro and meghan's posts that i am just a fat, pimply looser craving the cock mystef. So, with that i wanted to say i'm sorry; sorry you're such a boner-biting brown-clown. You are a highly revered flagpole sitter for the balogne cavalry. You are a rump-ranger, uphill gardener, ring-raider, anal pressure washer, cum dumpster. You always enjoy getting a clap from the back row. Hope you continue to put the shmock on your cock cuz you don't want to get those speed bumps. P.S. Call me for a nice little game i call hide the meat in the fridge P.P.S. These posts are all from different people."
The next post, from "cell phone addiction," makes fun of D.C. for allegedly being "Glued to [his] cell phone" and also reveals his real name. The next is from "crazed fan" and consists of over-the-top adoration ("ive always loved your work," etc.) punctuated with parenthetical accusations of homosexuality and expressions of hostility ("you are an oversized faggot" and "i just want to hit you in the neck . . . hard," etc.). The next, from "A Secret Admirer" likewise mocks D.C.'s cell phone use. The next post says merely "you damn democrat!"
The next, from "hw," appears to be a piece of sincere encouragement: "dear [D.C.], i just wanted to say that dont listen to anything that these mean kids at our school are writing. you are one of the sweetest boys at school and its really cool that you are goign after your dreams. the best of luck to you!" Again, it is noteworthy that even this (apparently) sympathetic author, who had clearly read the earlier posts, showed no alarm or concern regarding the putative threats they contained and did not contact the Harvard-Westlake administration or the police to warn them about any danger to D.C.
The next post, from "yo," returned to the mockery and taunting: "nope dont listen to her [D.C.] end it now." The next post is from "God": "[D.C.], this isn't why I created man. Stop ruining my plan, gayass." A later post, from "Mr. Manager," purported to be from "Danny Alexander's" manager, who claimed to be tired of lying about how good "Danny's" voice is. Another post purported to be from "Clive Davis" (a legendary figure in the popular music industry), claiming he wanted to sign "Danny Alexander" and asking for a callback at "(213) You-Are-Totally-Fucking-Gay." The final post on the printout is from "Ky Jelly Representative": "Hey [D.C.], im so excited to finally speak to you. We here at Ky Jelly we wanted to know if would be the *1250 spokesperson for our new anal lube. You obvisouly get fucked in the ass more than anyone else on earth. So who better to be a spokesperson than you. fucking ass clown. nigga what?"
Reading the sequence of posts from beginning to end, no reasonable person would foresee that any of it would be taken as a serious threat of violence. No reasonable person would believe that (at least) four people were sincerely threatening to take D.C.'s life. Taken together, all of the posts amount to nothing but a lot of adolescent sex-obsessed hyperbolic derision, sarcasm, and repulsive foolishness"Your music is sooo good and I love you sooo much," "You're a really attractive guyto boys!," "You're gay," "No, the people who are calling you gay are gay," "You have a small penis," and so forth. Even the authors of sympathetic posts, like "hw" and "Music Pro," did not manifest any belief that D.C. might actually be in peril. Rather, they merely advised him to ignore the mockery ("dont listen to anything that these mean kids at our school are writing"). Again, there is no evidence that anyone but D.C.'s parents contacted the school's administration or the police to warn of any potential danger to D.C.
Indeed, the record contains evidence that D.C. himself did not take any of the posts seriously. A declaration submitted in support of an anti-SLAPP motion filed by a different defendant states that D.C. "has been in Los Angeles openly socializing with friends in Westwood" and that D.C. admitted to a friend "that he was not traumatized by the incident and . . . thought that his father was crazy for making a big deal of the episode when he didn't care." Viewing R.R.'s post in the entire factual context, including the reaction of the entire audience, no reasonable person could have foreseen that the post would have been taken as a serious expression of intent to commit an unlawful act of violence. It was just one more vile joke in a string of vile jokes.
The majority's analysis fails to support a contrary conclusion. The first part of the majority's analysis dwells exclusively on the language of the post itself, ignoring the context. (Maj. opn., ante, at p. 1219.) No rebuttal of that analysis is necessary, because the majority concedes that "[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (U.S. v. Orozco-Santillan, supra, 903 F.2d at p. 1265; see maj. opn., ante, at p. 1213.)
Next, the majority relies on D.C.'s father's reaction to the posts as evidence that R.R.'s post constituted a true threat, but such reliance is misplaced. The majority mentions that D.C.'s father shut down the Web site and contacted the police, who in turn advised him to keep D.C. out of school until an investigation was completed. First, the evidence does not reveal *1251 precisely what the father told the police that prompted their recommendation. Second, the police later concluded that the posts, including R.R.'s, did not constitute genuine threats.[11] D.C.'s parents allowed D.C. to return to Harvard-Westlake for only one class before withdrawing him from the school and enrolling him in a school in Northern California, to which the entire family then moved. The majority says D.C.'s parents took such drastic measures only "[w]hen the police investigation dragged on" (maj. opn., ante, at p. 1220), but D.C.'s father's own declaration states that they enrolled D.C. in his new school just one week after informing Harvard-Westlake and the police about the postsD.C.'s father reported the posts on October 8, and D.C. was enrolled in his new school in Northern California on October 15. The majority also mentions that "D.C.'s father had to travel back and forth from the family's new residence to Los Angeles for business purposes." (Maj. opn., ante, at p. 1220.) D.C.'s father's overreaction to the post does not change it from a bad joke into a true threat, however, and the hardships borne by D.C.'s father are not relevant to the true threat analysis.
Regarding the rest of the factual context, the majority argues that although "the majority of posts may have been nonthreatening," that "does not lessen the effect of R.R.'s post," because "[t]he law did not obligate plaintiffs to view all of the posts as having the same purpose or intent." (Maj. opn., ante, at p. 1220.)[12] Also, according to the majority, "that students other than R.R. found the posts as a whole to be funny or amusing does not suggest how plaintiffs should have viewed R.R.'s post in particular." (Maj. opn., ante, at p. 1220.) The objective test, however, has nothing to do with how plaintiffs should have viewed (or were "obligate[d]" to view) R.R.'s post. Rather, the test asks whether a reasonable person, considering R.R.'s post in its entire factual context, would foresee that it would be interpreted as a serious threat of violence. Moreover, the other posts are relevant not just because most of *1252 them are, even when considered out of context, unambiguously nonthreatening. They are also relevant because they show that no one involved in the thread of posts viewed R.R.'s post as a serious threat.
As the majority recognizes and the case law reflects, the law requires this court to consider R.R.'s post in its full factual context, including the reaction of the audience, in determining whether the communication was a true threat under the objective test. (See, e.g., U.S. v. Orozco-Santillan, supra, 903 F.2d at p. 1265.) The majority's own analysis implicitly adopts that approach by inferring from the reaction of D.C.'s parents that it was reasonably foreseeable that R.R.'s post would be taken as a threat. That analysis, however, neglects both the content of the other posts and the reaction of everyone who read them (other than D.C.'s parents). When viewed in light of the entire context (as it must be), R.R.'s post appears as just one more link in a chain of vulgar, adolescent rants, and no one but D.C.'s parents appears to have had any trouble figuring that out. No reasonable person would have foreseen that the post would be taken as a genuine threat, and the extreme reaction of D.C.'s parents (pulling their son out of school and enrolling him in a different school hundreds of miles away, just one week after discovering the posts), which D.C. himself described as "crazy," does not constitute evidence to the contrary.
Moreover, the majority at most succeeds in showing that the record contains evidence that, if credited, would be sufficient to sustain a ruling in plaintiffs' favor on the issue. That would mean that plaintiffs have made a prima facie showing that R.R.'s post is not protected, but it would not mean that defendants have failed to make a prima facie showing that the post is protected. The central point is that, under the prima facie showing standard, it does not matter whether the record contains some evidence that might support the conclusion that the speech is unprotected. Defendants do not need to prove that the speech is protected as a matter of law. (Navellier v. Sletten, supra, 29 Cal.4th at pp. 94-95; Soukup, supra, 39 Cal.4th at p. 286.) Rather, they need only make a prima facie showing of constitutional protection. The presence in the record of evidence that might support a contrary inference does not mean they have failed to carry that burden, and consideration of the entire factual context shows that they have carried it. And again, plaintiffs expressly concede that "[a]s to each of the elements of a `true threat' . . . there is here conflicting evidence."[13]
*1253 The record contains evidence from which a reasonable trier of fact could conclude that it was not reasonably foreseeable that R.R.'s post would be taken as a serious expression of intent to inflict bodily harm. I therefore conclude that defendants have carried their burden of making a prima facie showing of constitutional protection under the objective test for true threats.

V. Hate Crimes and Attorney's Fees
Toward the end of its free speech analysis, the majority explains the rationale for its decision as follows: A defendant who prevails on an anti-SLAPP motion is entitled to an award of attorney's fees, but "[i]n a case alleging statutory hate crimes and related common law claims, the courts should ensure that the anti-SLAPP statute does not discourage victims from seeking relief." (Maj. opn., ante, at p. 1224.) Thus, according to the majority, in order to avoid deterring hate crime victims from seeking redress for their injuries, "[i]n a case alleging statutory hate crimes" the court should place a thumb on the scale against granting an anti-SLAPP motion and consequent award of attorney's fees. Moreover, according to the majority, a court "in a case like this one" should endeavor to make sure that the anti-SLAPP motion is denied at the first step of the analysis, so that the plaintiffs are not put to the "`grossly unfair burdens'" of showing that their claims are prima facie meritorious. (Maj. opn., ante, at p. 1224, quoting Flatley v. Mauro (2006) 39 Cal.4th 299, 318 [46 Cal.Rptr.3d 606, 139 P.3d 2] (hereafter Flatley).) I conclude that the majority's rationale fails on multiple levels.
It would make no sense to accord preferential treatment to every plaintiff who merely alleges a hate crimes claim, because anyone can allege any claim, including a hate crimes claim, regardless of whether the claim has any merit. Those who allege meritless claims, including hate crimes claims, do not deserve any special solicitude from the courts. On the contrary, the Legislature has provided that those who allege meritless claims targeting speech in connection with issues of public interest deserve to be stopped in their tracks and forced to pay their opponents' attorney's fees. (See Code Civ. Proc., § 425.16.)
Presumably aware that a rule of preferential treatment for every plaintiff who alleges a hate crimes claim would be insupportable, the majority *1254 qualifies its rationale in the following way: In "a case like this one," where "the communication at issue appears on its face to be an intentional threat of bodily harm and was reasonably interpreted as such by the recipient," the court's analysis at the first step of an anti-SLAPP motion should disregard evidence that the defendant's innocent intent made his speech constitutionally protected. (Maj. opn., ante, at p. 1224.) Thus, not every hate crime plaintiff is entitled to avoid the second step (at which point the plaintiff would be required to make a prima facie showing of merit) by having the court disregard the defendant's evidence of intent at the first step. Rather, that special protection is accorded only to plaintiffs like those in this case, because "the communication at issue appears on its face to be an intentional threat of bodily harm and was reasonably interpreted as such by the recipient." (Maj. opn., ante, at p. 1224.)
The problem with the majority's approach is this: How does the majority know those conditions have been met? What standard of proof is being applied? To what evidence? Who has what burden?
The difficulties with the majority's approach become clearer if we consider each condition(1) "the communication at issue appears on its face to be an intentional threat of bodily harm . . ." and (2) the recipient "reasonably interpreted" it as a threatin more detail. Is the "communication at issue" being considered in context or out of context? The phrase "on its face" presumably means "considered out of context," but why should a court be interested in considering the communication out of context? For purposes of interpreting purportedly threatening speech, context is everything. "I'm going to kill you" could be a death threat or a piece of friendly banter, depending on context. As a result, a plaintiff could easily base a frivolous hate crimes claim on a communication taken out of context. It is consequently impossible to understand why, before reaching even the first step of the analysis, a court should consider the communication out of context and then, if it appears to be a threat, use that as a basis to favor the plaintiff in the remainder of the analysis.[14]
The majority's approach to the second conditionthat the recipient "reasonably interpreted" the communication as a threatraises even more serious concerns. Putting aside the issue of reasonableness, which is ordinarily a question of fact (see, e.g., Smith v. Selma Community Hospital (2008) 164 Cal.App.4th 1478, 1509 [80 Cal.Rptr.3d 745]), how does the majority know that D.C. interpreted R.R.'s post as a threat of bodily harm? The record *1255 contains no declaration from D.C., so how does the majority know? The majority cannot be relying on the allegations of the complaint, because, again, anyone can allege anything. The only other possible basis for the majority's conclusion is the declaration of D.C.'s father, who states that (1) apart from attending one class period, D.C. "did not return to the school due to fear for his life," and (2) "due to the threats . . . [D.C.] started to suffer from frequent and severe panic attacks which required medical attention, and from which he still suffers occasionally to this date." Although those statements might contain some ambiguity, they do seem to say that, according to D.C.'s father, D.C. believed his life was threatened. I will therefore assume the statements do mean D.C. interpreted the post as a threat, so they do constitute evidence that supports the majority's conclusion.
The problem is that the record contains contrary evidence as well. As already noted, the record contains a declaration stating that D.C. told a friend (identified by name) that "he was not traumatized by the incident and . . . thought that his father was crazy for making a big deal of the episode when he didn't care." (Italics omitted.) Those statements might contain some ambiguity as well, but they do seem to say that D.C. did not believe his life was threatened.
So we have a conflict. According to D.C.'s father, D.C. believed he was threatened. According to a friend of D.C.'s (identified by name), D.C. said he did not believe he was threatened. Faced with that conflict, the majority concludes that D.C. did in fact interpret R.R.'s post as a threat. And that is the majority's rationale for disregarding, at the first step of the anti-SLAPP analysis, R.R.'s evidence concerning his intent. (Maj. opn., ante, at p. 1224.) The bottom line is that the majority believes D.C.'s father, so the majority reasons that it need not take seriously what R.R. says.
As the foregoing discussion illustrates, the source of the difficulties with the majority's approach is that the majority is engaging in a partial evaluation of the merits before even getting to the first step of the analysis. The majority concludes that the post "appears on its face to be an intentional threat of bodily harm" (a merits issue) and "was reasonably interpreted as such by the recipient" (also a merits issue), and the majority then relies on those conclusions to shape its analysis of the first step by disregarding R.R.'s evidence of his intent. But that approach turns the well-established procedure for analyzing anti-SLAPP motions on its head, because the evaluation of the merits of the plaintiff's claims is supposed to take place at the second step, not at the first (or before the first). (See, e.g., Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Moreover, the merits evaluation that is conducted at the second step is itself subject to well-established rulesthe plaintiff has the burden of introducing *1256 evidence that, if credited, would be sufficient to support a favorable judgment. (See, e.g., Taus v. Loftus, supra, 40 Cal.4th at pp. 713-714.) For the majority's pre-first-step partial evaluation of the merits in an alleged hate crimes case, however, there are no such well-defined procedural constraints.
One final observation concerning the majority's discussion of its rationale: In explaining the purportedly undesirable consequences of taking seriously the defendant's evidence of intent "in a case like this one," the majority quotes the Supreme Court as stating that to require a plaintiff, this early in the litigation, to make a prima facie showing of merit would constitute "`grossly unfair burdens to impose on a plaintiff who is himself the victim of the defendant's [wrongful] activity.'" (Maj. opn., ante, at p. 1224, alteration in maj. opn., quoting Flatley, supra, 39 Cal.4th at p. 318.) The quotation, however, is from Flatley, in which the Supreme Court explained that it would be "grossly unfair" to force the plaintiff, early in the litigation, to make a showing of prima facie merit if the conceded or conclusively established facts already showed the defendant's conduct was illegal as a matter of law. (Flatley, supra, 39 Cal.4th at pp. 317-318, 320.) The Supreme Court never suggested that the burdens imposed at the second step of the anti-SLAPP analysis would be grossly unfairor unfair at allin any other circumstance. The majority's quotation from Flatley in this context thus strongly suggests that, before reaching the first step of the analysis, the majority has assumed that R.R.'s conduct was unlawful and, hence, that plaintiffs' claims have (at least partial) merit.[15]
I conclude that the majority's rationale for its approach does not succeed. A merely alleged hate crimes claim cannot possibly serve as a basis to alter the analysis in plaintiffs' favor, and any evaluation of the claim's merits should take place at the second step, as the Supreme Court has repeatedly held. In sum, defendants' anti-SLAPP motion should stand or fall on its intrinsic merits, not on the basis of procedural shortcuts created by the judiciary to favor certain types of claims.

*1257 VI. Speech in Connection with an Issue of Public Interest
The majority concludes that defendants have also failed to show that R.R.'s post was in connection with an issue of public interest. (Maj. opn., ante, at p. 1226.) Again, I disagree.
As the majority acknowledges, the anti-SLAPP statute expressly provides that it "shall be construed broadly." (Code. Civ. Proc., § 425.16, subd. (a); see also Nygård, Inc. v. Uusi-Kerttula (2008) 159 Cal.App.4th 1027, 1039-1042 [72 Cal.Rptr.3d 210] (hereafter Nygård); Sipple v. Foundation for Nat. Progress (1999) 71 Cal.App.4th 226, 236 [83 Cal.Rptr.2d 677].) In keeping with that statutory command, the case law sets an extremely low threshold for meeting the requirement that the speech be in connection with an issue of public interest. For purposes of the statute, an issue of public interest is "any issue in which the public is interested." (Nygård, supra, 159 Cal.App.4th at p. 1042.) "In other words, the issue need not be `significant' to be protected by the anti-SLAPP statuteit is enough that it is one in which the public takes an interest." (Ibid.) As a result, issues of public interest include matters that could be described as mere "`celebrity gossip'" or "`tabloid' issues." (Id. at pp. 1039, 1042.) As the majority also acknowledges, "[a] public issue is implicated if the subject of the statement or activity underlying the claim . . . was a person or entity in the public eye ...." (Jewett v. Capital One Bank (2003) 113 Cal.App.4th 805, 814 [6 Cal.Rptr.3d 675]; see maj. opn., ante, at p. 1226.)
Two cases illustrate the point. In Seelig v. Infinity Broadcasting Corp. (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] (hereafter Seelig), the plaintiff had been one of 50 contestants on the television show Who Wants to Marry a Multimillionaire. (Id. at p. 801.) "During her time on air, she stated only her name, that she was from San Francisco, and that she worked in sales at KFRC, a San Francisco radio station. Her total participation in the television broadcast lasted less than one minute." (Ibid., fn. omitted.) The hosts and producer of a morning radio show made derisive comments about the plaintiff, who then sued. (Id. at pp. 802-806.) The Court of Appeal concluded that the plaintiff, by participating in the television show, had "voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (Id. at p. 808.) Because "[t]he offending comments arose in the context of an on-air discussion . . . about a television show of significant interest to the public and the media," the comments were in connection with an issue of public interest. (Id. at pp. 807-808.)
Similarly, in Hall v. Time Warner, Inc. (2007) 153 Cal.App.4th 1337 [63 Cal.Rptr.3d 798] (hereafter Hall), the plaintiff was the elderly former housekeeper of Marlon Brando. (Id. at p. 1342.) When Brando died and reports *1258 revealed that he had named the plaintiff in his will, a reporter for the television show Celebrity Justice visited her (she resided in a retirement home and "had been suffering from dementia and Alzheimer's disease for several years") and videotaped an interview with her, part of which was included in a segment broadcast that evening. (Ibid.) The entire segment lasted "approximately three minutes." (Ibid.) Because "[t]he public's fascination with Brando and widespread public interest in his personal life made Brando's decisions concerning the distribution of his assets a public issue or an issue of public interest," the plaintiff "became involved in an issue of public interest by virtue of being named in Brando's will." (Id. at p. 1347.)
Given that legal background, the majority's analysis of whether R.R.'s post was in connection with an issue of public interest is not easy to understand. The majority concedes that according to plaintiffs themselves "D.C. had a record album with a planned release date, had broadcast a song worldwide via satellite radio, and had played the leading role in a feature film presented at an internationally acclaimed film festival. He also toured under the auspices of a nationally recognized radio network." (Maj. opn., ante, at p. 1229.) But the majority nonetheless concludes that "[t]here is no evidence that [D.C.] was a nationally known singer or actor even under his pseudonym, Danny Alexander." (Maj. opn., ante, at p. 1229.) There are two problems with that claim. First, the facts just described do constitute circumstantial evidence that D.C. was a nationally (and perhaps internationally) known singer or actor. Second, the majority is again holding defendants to an incorrect legal standardthere is no requirement that in order for a communication to be in connection with an issue of public concern, the subject of the communication must be nationally known. Rather, as the majority elsewhere concedes, it is sufficient for the subject of the communication to be "a person or entity in the public eye." (Jewett v. Capital One Bank, supra, 113 Cal.App.4th at p. 814; see maj. opn., ante, at p. 1226.) The evidence about D.C.'s accomplishments as a singer and actor shows that he was indeed a person in the public eye.
For identical reasons, the majority's observation that "D.C. was no Brando" (maj. opn., ante, at p. 1229) is of no consequence. The case law does not require that he be Brando. It requires only that he be a person in the public eye. Moreover, contrary to the majority's suggestion, R.R.'s admission that he knew nothing about D.C.'s involvement in singing and acting until he saw D.C.'s Web site is not evidence tending to show that D.C. was not a person in the public eye. (Maj. opn., ante, at p. 1229.) There are surely countless persons in the public eye of whom R.R. has never heard. D.C.'s accomplishments in the entertainment industry show that he is a person in the public eye, and R.R.'s previous ignorance of those accomplishments does not constitute evidence to the contrary.
*1259 The majority adds that "D.C.'s use of a Web site in pursuing an entertainment career did not, ipso facto, put him in the public eye." (Maj. opn., ante, at p. 1229.) I agree that the Web site did not, by itself, make D.C. a person in the public eye. Rather, the Web site merely added to the evidence that D.C. was a person in the public eye. It was not just a Web site (or MySpace or Facebook page) of a teenager who aspired to be an entertainerit was the Web site of a singer/actor who had played the leading role in a feature film presented at an internationally acclaimed film festival, who had toured under the auspices of a nationally recognized radio network, who had a song broadcast worldwide via satellite radio, and who had a record album with a planned release date.
The majority also claims that because R.R.'s post "is devoid of any information about D.C.," it is not "analogous to a magazine article that discusses a celebrity or to a television interview or radio show about a celebrity." (Maj. opn., ante, at p. 1230.) In a similar vein, the majority reasons that, according to R.R., his post "was part of a joke played on D.C. by other teenagers," but if the post was indeed a joke then "it did not implicate a public issue." (Maj. opn., ante, at p. 1229; see also maj. opn., ante, at pp. 1199, 1210.) The problem with both arguments is that a joke can be made in connection with an issue of public concern. That is, communications in connection with issues of public concern do not exclude jokes and are not limited to informative discussions in magazine articles or television or radio shows. If they were, Seelig might well have been decided differentlyit is not clear how calling someone a "`big skank'" (Seelig, supra, 97 Cal.App.4th at pp. 803, 811) and ridiculing her for refusing to appear on a morning radio show provides information about her or is anything more than a mere joke targeting someone in the public eye. The majority's emphasis on the age of those involved here ("teenagers") is likewise of no moment. There is nothing legally or factually impossible about a teenager being "a person . . . in the public eye" (Jewett v. Capital One Bank, supra, 113 Cal.App.4th at p. 814) or engaging in speech (including jokes) in connection with an issue of public interest.
The majority offers no argument or explanation in support of its sweeping exclusion of jokes from the category of communications in connection with issues of public interest for purposes of California's anti-SLAPP statute. As authority, the majority cites a Seventh Circuit case, a New York federal district court case, and a Massachusetts case, none of which involved California law. (See maj. opn., ante, at p. 1229.) Those cases held, in different contexts and under different standards, that certain jokes were not about matters of public concern. (See Polish American Congress v. F.C.C. (7th Cir. 1975) 520 F.2d 1248, 1250, 1253-1256; Shub v. Westchester Community College (S.D.N.Y. 2008) 556 F.Supp.2d 227, 244-246; Pereira v. Commissioner of Social Services (2000) 432 Mass. 251 [733 N.E.2d 112, 116 & *1260 fns. 8, 9, 118-119].) Those cases are irrelevant. Not every joke is in connection with an issue of public concern, but that does not mean that every joke is not in connection with an issue of public concern. Some jokes are (such as jokes about persons in the public eye), and some jokes are not (such as the purely private jokes in the cases cited by the majority). I conclude that there is no basis for the majority's holding that every joke, just because it is a joke, is not in connection with an issue of public concern (maj. opn., ante, at pp. 1199, 1210, 1229), a holding that is profoundly hostile to First Amendment rights.
D.C. was a singer and actor who had achieved significant successes in both fields, making him much more of a person in the public eye than the plaintiff in Seelig. A joke or other communication about him is therefore in connection with an issue of public interest.
The majority states that "[n]othing we have said will chill free speech" because "[t]he narrow question on appeal" concerns only an anti-SLAPP motion, leaving open the possibility that, after a full trial on the merits, defendants will not "be found liable on any of plaintiffs' causes of action." (Maj. opn., ante, at p. 1225.) The Legislature sees things differently. Before the anti-SLAPP statute was enacted, it was always possible for defendants to prevail on the merits at trial. But in enacting the anti-SLAPP statute, the Legislature found that the possibility of prevailing on the merits at trial was not good enough, because the burdens of defending meritless litigation were in fact having a chilling effect on speech in connection with issues of public interest. (See, e.g., Varian Medical Systems, Inc. v. Delfino (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958]; Code Civ. Proc., § 425.16, subd. (a).) The Legislature enacted the anti-SLAPP statute to enable defendants to terminate such litigation early, thereby limiting defense costs and counteracting the chilling effect that those costs created. (See, e.g., Varian Medical Systems, Inc. v. Delfino, supra, 35 Cal.4th at p. 192.) It is therefore incorrect to say that because this is merely an anti-SLAPP case it will not "chill free speech." (Maj. opn., ante, at p. 1225.)
As I have explained, the majority opinion alters the law in multiple waysforcing defendants to show their conduct is protected as a matter of law, creating new legal rules that allow courts to disregard defendants' evidence, and holding that jokes are not communications in connection with issues of public interestthat drastically tilt the playing field against defendants who bring anti-SLAPP motions. In so doing, the majority has weakened the anti-SLAPP statute and thus strengthened the chilling effect that the statute was intended to curtail.
*1261 For all of the foregoing reasons, I disagree with all of the majority's substantive conclusions. Defendants have made a prima facie showing that R.R.'s post was protected speech and was made in connection with an issue of public interest. I therefore dissent.
NOTES
[1] We express no view as to whether D.C.'s parents were proper parties to the hate crimes claim.
[1] The cases developing and explaining the prima facie showing standard for purposes of an anti-SLAPP motion do so in the context of the second step of the analysis. (See, e.g., Soukup, supra, 39 Cal.4th at p. 291.) The case law is nonetheless uniform in holding that at both the first step and the second step only a prima facie showing is required. There is no reasonand the majority provides noneto believe that at the first step of the analysis of an anti-SLAPP motion "prima facie showing" means something different from what it means at the second step.
[2] The majority's reasoning on this point is also based on the "self-contradiction" theory, which I discuss in part III, post.
[3] For example, constitutional protection of speech often depends upon the intent of the speaker. As a result, the majority's opinion will often make it impossible for defendants to get past the first step of the anti-SLAPP analysis because it will rarely, if ever, be possible to establish the speaker's intent as a matter of law.
[4] In a later Ninth Circuit case in which the defendant was convicted of threatening the President of the United States, the court interpreted the relevant federal statute in terms of the objective test; the court did not reach the issue of whether the subjective test was constitutionally required, because the defendant did not raise any First Amendment issues. (U.S. v. Romo (9th Cir. 2005) 413 F.3d 1044, 1051, fn. 6.) As a result, subsequent Ninth Circuit cases have treated the issue as a matter of intracircuit conflict and have applied both the subjective test and the objective test. (See U.S. v. Stewart (9th Cir. 2005) 420 F.3d 1007, 1017-1018; Fogel v. Collins (9th Cir. 2008) 531 F.3d 824, 831.)

I also note that the federal decisions have not always characterized Virginia v. Black accurately. The Seventh Circuit, for example states that the Supreme Court's "plurality offered a new definition of true threats" and then quotes the definition requiring that "`the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence'" and acts "`with the intent of placing the victim in fear of bodily harm or death.'" (U.S. v. Parr (7th Cir. 2008) 545 F.3d 491, 499, italics omitted.) But that new definition was not offered by a mere pluralityit appears in part III of Justice O'Connor's opinion and thus is part of the majority opinion of the Supreme Court. (See Virginia v. Black, supra, 538 U.S. at pp. 347, 359-360 [Justice O'Connor "delivered the opinion of the Court with respect to parts I, II, and III"].) Justice O'Connor's opinion was joined in its entirety by Chief Justice Rehnquist and Justices Stevens and Breyer, and it was joined as to parts I through III by Justice Scalia. (Id. at p. 368 (conc. & dis. opn. of Scalia, J.) ["I join Parts I-III of the Court's opinion."].) Parts I through IIIincluding their new definition of true threatsare therefore the opinion of the court and binding on all state and lower federal courts.
[5] To illustrate: R.R. has never executed a declaration stating "I want to kill D.C. I declare under penalty of perjury that the foregoing is true and correct."
[6] Both in its discussion of the subjective test and elsewhere, the majority relies on various factual claims about "cyberbullying," which the majority has collected from various Web sites. (Maj. opn., ante, at pp. 1218, 1222.) No party has advanced the factual contentions on which the majority relies, no party has introduced the evidence (i.e., the Web sites) from which the majority derives those facts, no party has requested judicial notice of any of that material, and it is unlikely that it would be judicially noticeable even upon request. (See Evid. Code, §§ 451, 452.)
[7] I am not unmindful of the emotional harm that this kind of mockery can cause, particularly when done en masse by the target's schoolmates. The issue here, however, is not whether D.C. suffered emotional harm as a result of the posts. (Evidence in the record (see post) indicates that he did not.) The issue is whether a reasonable person would have anticipated that R.R.'s post would be interpreted as a genuine threat of violence.
[8] Later posts appear to indicate this is a reference to a song by "Danny Alexander" entitled "Freakyside" (or "On the Freaky Side").
[9] The "405" is a freeway in the Los Angeles area.
[10] It is not clear that expert testimony would be admissible on this issue at all. The question of whether a reasonable person would interpret the post as a genuine threat is a quintessential jury question, and there is no reason to believe that plaintiffs' retained witness has any more expertise than the jurors concerning the manner in which a reasonable person would interpret the post.
[11] The majority states that the conclusions reached by the police "are not controlling under the true threat analysis." (Maj. opn., ante, at p. 1225.) Although the police's opinion that the post was protected speech is not controlling, it does constitute evidence that a reasonable person would not have thought the post was a genuine threat of violence.
[12] After acknowledging that plaintiffs admit "they perceived only six of the 34 derogatory posts as serious threats of bodily harm," the majority states that "[a]ccordingly, plaintiffs sued only six students." (Maj. opn., ante, at p. 1220.) Plaintiffs, however, sued at least one student whose posts, according to D.C.'s father, "do not look threatening," and D.C.'s father states that "[s]ome of the postings including threats of violence still do not have identified authors." Also, in addition to the six named student defendants, plaintiffs sued "STUDENT DOES 1 through 50" and "PARENT OF STUDENT DOES 1 through 100," and the complaint describes at length the discovery plaintiffs intend to conduct in order to identify everyone involved in the Web site incident. Thus, contrary to the majority's implication, plaintiffs did not sue only the people who (purportedly) threatened D.C. Plaintiffs sued everyone they could identify, including students who plaintiffs admit did not threaten anyone, and plaintiffs expressed the intention of using discovery to widen the net still further.
[13] Some of plaintiffs' evidence might eventually turn out to be difficult to credit. For example, the majority relies on D.C.'s father's statements that "after the postings people approached [D.C.] . . . and asked him about being gay" and that "[i]t was clear that others that read the posts believed the comments about his sexual orientation and felt concern for him and his safety." The declaration says nothing more about any of this, about who these "people" and "others" are, what they said, or how it was "clear" that they believed D.C. was gay and in danger. D.C.'s father's declaration also states that D.C. "started to suffer from frequent and severe panic attacks." What is notably absent from the current record, however, is a declaration from D.C. himself. As already noted, the record contains a declaration indicating that D.C. has admitted he "was not traumatized by the incident" and "thought that his father was crazy for making a big deal of the episode when he didn't care." (Italics omitted.) And it is difficult to believe that any reasonable person reading the posts on D.C.'s Web site could have taken them as serious, credible, or accurate reports of his sexual orientation.
[14] I say that the majority does all of this "before reaching even the first step" because the majority relies on these conclusionsthat the communication on its face appears to be a threat and was interpreted as such by the recipientas the basis for its approach to the first step (namely, disregarding R.R.'s evidence concerning his intent).
[15] In other ways, however, the majority opinion reflects recognition that Flatley does not apply here. Plaintiffs have argued both in the trial court and on appeal that defendants' anti-SLAPP motion should be denied under Flatley on the ground that the conceded or conclusively established facts show that R.R.'s post was illegal. If the majority agreed with that argument, then the majority's entire true threat analysis would be superfluous. But instead of agreeing with plaintiffs' argument, the majority never mentions it, presumably because the majority understands that the conceded and conclusively established facts do not show that R.R.'s post was illegal. As a result, the majority's own reasoning shows that Flatley and its remarks about "grossly unfair burdens" have nothing to do with this case.